IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON


WILLIAM EDWARD REBROOK, III,

      Petitioner,

v.                         Case No. 2:10-cv-01009

UNITED STATES OF AMERICA,

      Respondent.


## PROPOSED FINDINGS AND RECOMMENDATION

### Introduction

Currently pending before the court is a Petition for a Writ of Error Coram Nobis, filed August 9, 2010. (ECF No. 103.) Petitioner asserts that his prior conviction for wire fraud must be set aside because the Supreme Court, in <u>Skilling v. United States</u>, 130 S. Ct. 2896 (2010), declared that fraudulent deprivations of "the intangible right of honest services," are properly confined only to bribery and kickback schemes. Because Petitioner's misconduct entailed no bribe or kickback, he argues that it does not fall within the proscription set forth in 18 U.S.C. § 1346. The United States has responded (ECF No. 109), and Petitioner has replied (ECF No. 110), making the matter ripe for decision. On April 6, 2011, the court conducted a hearing on the Petition. (ECF No. 116.) Thereafter, the court permitted additional briefing on the standards of review that govern this coram nobis proceeding.

Petitioner filed a brief (ECF No. 117), the United States responded (ECF No. 120), and Petitioner replied (ECF No. 121). On August 24, 2011, and September 22, 2011, Petitioner submitted letters to the court containing additional authority. (ECF Nos. 122 and 123.)

<u>Procedural Background</u>

On June 17, 1993, a federal grand jury returned a two-count indictment against Petitioner, William Edward ReBrook, III, charging him with one violation of 18 U.S.C. §§ 1343 and 1346 and one violation of 15 U.S.C. § 78ff and 78j(b) and 17 U.S.C. § 240.10b-5. <u>United States v. ReBrook</u>, 2:93-cr-00151 (S.D. W. Va.) (# 1).[1] Following a jury trial conducted November 2-5, 2003, the jury convicted Petitioner on both counts. (# 60.) Petitioner moved for a new trial, which was denied. (# 71.) On February 7, 1994, the Honorable Charles H. Haden, II, United States District Judge for the Southern District of West Virginia, sentenced Petitioner to serve twenty-seven months in prison on each count with the sentences running concurrently, to be followed by a three-year term of supervised release. (# 73.) Judge Haden also ordered Petitioner to pay a special assessment of $100.00.[2]

Petitioner filed a notice of appeal. (# 74.) The United

---

[1]  The docket sheet of the criminal case is not an electronic file. In this Proposed Findings and Recommendation, references to the documents in the criminal case will be designated "# ___;" references to documents in the instant case will be designated "ECF No. ___."

[2]  Petitioner has discharged his sentence. (ECF No. 103, p. 2.) Petitioner served eighteen months at FCI-Morgantown, two months at a half-way house and two years on supervised release. (ECF No. 103, p. 7.)

States Court of Appeals for the Fourth Circuit reversed Petitioner's securities fraud conviction under the misappropriation theory because that theory had been rejected by the Fourth Circuit in United States v. Bryan, 58 F.3d 933 (4th Cir. 1995), but affirmed the wire fraud conviction. United States v. ReBrook, 58 F.3d 961, 965-67 (4th Cir. 1995), cert. denied, 516 U.S. 970 (1995). In United States v. O'Hagan, 521 U.S. 642, 649-650 (1997), the Supreme Court expressly abrogated Bryan, and held the misappropriation theory under 15 U.S.C. § 10(b) is viable. However, the government took no further action related to the securities fraud claim against Petitioner.

### Factual Background

The facts underlying Petitioner's offense conduct, as found by the Fourth Circuit on Petitioner's direct appeal, are that in April of 1990, Elton "Butch" Bryan, Director of the West Virginia Lottery Commission ("Lottery Commission"), hired Petitioner to serve as the Commission's attorney.   The Fourth Circuit found as follows:

> According to the evidence presented at trial, the general elections for statewide political offices in the autumn of 1992 were to have a direct effect on the expansion of the video gaming market in West Virginia. It was the Government's theory at trial that, from a date early in 1992, [Petitioner] had knowledge of the Governor's undisclosed plans to allow a statewide expansion of the video lottery immediately following the general election. In particular, Bryan testified at trial that  at various points he told [Petitioner] of conversations that he had with Governor Gaston Caperton concerning the expansion of the video lottery.
>
> Bryan passed on to [Petitioner] even more sensitive information than that of a general plan for expansion of

3

the video lottery: Bryan informed [Petitioner] of the selection process by which the contract was to be awarded and, most importantly, which company Bryan intended to win the contract. Bryan testified that at some point in early 1992 he had decided, as the Director of the Lottery Commission, that when the video lottery was expanded, the Lottery Commission would award what is commonly referred to as a "sole source" contract to one of the competing gaming companies. A sole source contract, in the context of this case, means that the company to which the contract to expand the video lottery was awarded would be responsible for providing all of the machines and services to the state and would receive approximately $25 million in gross revenues. Most importantly, Bryan testified that before the general election he told [Petitioner]-despite rules providing for the unbiased awarding of such contracts-that the Lottery Commission would award the sole source contract to a company named Video Lottery Consultants, Inc. ("VLC").

As the attorney for the Lottery Commission, [Petitioner] learned additional information concerning VLC and other video lottery competitors. For example, on or about September 23, 1992, Bryan discussed the status of VLC with the company's chief executive officer. That officer told Bryan that the stock's value had dropped approximately 50% in price over the preceding two weeks due to adverse administrative rulings in Australia where VLC also conducted business and that the stock's value would not be dropping any further. This information was not made public by VLC. [Petitioner] learned of the contents of Bryan's telephone call that same day from either Bryan himself or Jim Moran, an employee with a competing video lottery company.

On September 24, 1992, [Petitioner] used all his available funds to purchase 100 shares of VLC stock, valued at $14.25 per share. Furthermore, [Petitioner] passed on the information he learned about the financial health of VLC to two friends who then purchased an additional 6,000 shares of VLC stock in their names. Following his purchase of VLC stock, [Petitioner] continued to represent the Lottery Commission without informing the Lottery Commission that he owned stock in VLC or that he stood to benefit substantially from the contemplated expansion of video lottery through a single source contract awarded to VLC.

United States v. ReBrook, 58 F.3d 961, 963-64 (4th Cir. 1995)

(footnote omitted).  Notably,

[t]he Government also entered into evidence a tape-

4

recorded conversation between ReBrook and Bernard Folio, a local political figure. In that conversation, ReBrook repeatedly stated to Folio that the Governor of West Virginia was going to allow the expansion of the video lottery "the day after the [1992] general election." (J.A. 191.)

Id. at 963, n.1.

## Arguments of the Parties

Petitioner has filed this petition for a writ of error coram nobis pursuant to 28 U.S.C. § 1651 and seeks to set aside his conviction for wire fraud under 18 U.S.C. §§ 1343 and 1346 in light of the Supreme Court's recent rulings in Skilling v. United States, 130 S. Ct. 2896 (2010) and Black v. United States, 130 S. Ct. 2963 (2010).  (ECF No. 103, p. 2.)

Petitioner relies on Skilling and its finding that 18 U.S.C. § 1346 is unconstitutionally vague and "criminalizes only schemes to defraud that involve bribes or kickbacks."  (ECF No. 103, p. 7.) Petitioner asserts that

> [i]n the present case, there were no allegations that Petitioner received bribes or kickbacks.  The indictment alleged that he had deprived his employer, the State of West Virginia, of its "intangible right to honest services."  The jury was instructed only on this honest services theory.  At no point did the United States assert or present any evidence that Petitioner actually received bribes or kickbacks. Consequently, because the United States Supreme Court has held that the honest services wire fraud theory is unconstitutionally vague and the evidence of bribes or kickbacks are [sic] necessary to sustain a wire fraud conviction, justice requires that Petitioner's wire fraud conviction be set aside through this coram nobis procedure.

(ECF No. 103, p. 8.)

Petitioner asserts that United States v. Mandel, 862 F.2d 1067

5

(4th Cir. 1988) is analogous. In that case, former Maryland Governor Marvin Mandel was convicted of mail fraud under a loss of honest services theory. After Governor Mandel finished serving his sentence, the Supreme Court issued its decision in McNally v. United States, 483 U.S. 350 (1987), holding that the mail fraud statute does not protect against schemes to defraud persons of their intangible rights such as the right to honest government. (ECF No. 103, pp. 8-9.) Because there was only one theory in the case against Mandel, that the State of Maryland and its citizens were defrauded of his honest and faithful services, the Fourth Circuit granted coram nobis relief, setting aside the convictions and ordering the repayment of any fines paid. (ECF No. 103, pp. 9-10.) Petitioner argues that as in Mandel, the only theory asserted against him was honest services wire fraud. Under Skilling, Petitioner argues that his conviction for wire fraud cannot be upheld because honest services wire fraud has been found to be unconstitutionally vague and there is no evidence of bribery or kickbacks. (ECF No. 103, pp. 9-10.)

A year after McNally, Congress amended Title 18, Chapter 63, relating to fraud offenses, by adding Section 1346, which reads: "For the purposes of this chapter, the term 'scheme and artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Petitioner points out that it was this provision that the Court in

Skilling found to be unconstitutionally vague.  (ECF No. 103, p. 9.)

Petitioner further contends, relying on Mandel, that the only theory asserted against him was honest services wire fraud and, under Mandel, the United States cannot "after the fact cobble together some new theory of wire fraud which was not presented to the jury either in the evidence or in the instructions." (ECF No. 103, p. 9.)

As a result, Petitioner seeks the following relief:

> to review this **PETITION** and find that it is not subject to summary dismissal, to order Respondent to file an answer, motion, or other response within a fixed period of time, to have the entire record in the underlying criminal action, ... *United States of America v. William Edward ReBrook III*, Criminal No. 2:93-00151, made a part of the record in the present case, and to issue an order setting aside Petitioner's conviction for one count of wire fraud based upon the United States Supreme Court's decision in Skilling, which found the loss of honest services theory of wire fraud to be unconstitutionally vague, and to order any fines paid by Petitioner to be returned to him.  Additionally, Petitioner respectfully seeks all other relief to which Petitioner may be entitled under the law.

(ECF No. 103, p. 12.)

In response, the United States argues that the Court should deny the Petition, as such relief is granted only to correct errors of the most fundamental character and only under circumstances compelling such action to achieve justice.  The United States points out that where Petitioner raises a claim not first raised on direct appeal, "it falls to him to show cause for the default, or

to demonstrate that he is actually, factually innocent of the charges brought against him." (ECF No. 109, p. 1) (citing <u>Bousley v. United States</u>, 523 U.S. 614, 624 (1983)).

The United States asserts that the record below makes clear that the Petitioner "was charged with and that the jury convicted him of defrauding the State of West Virginia and the West Virginia Lottery of property [footnote omitted], that is, certain confidential information that had come into his hands in his capacity as attorney for the Lottery and which he was under a duty to protect." (ECF No. 109, pp. 1-2.) While the United States concedes that the jury may well have convicted Petitioner under the "honest services" theory charged in the wire fraud count as well, "given the record, it is inescapable that the jury found defendant guilty of engaging in a scheme to defraud the State of property, that is, confidential, inside information relating to certain corporate stock." (ECF No. 109, p. 2 n.1.) The United States contends that that theory was approved by the Supreme Court in <u>Carpenter v. United States</u>, 484 U.S. 19 (1987).

The United States argues that the "property" fraud theory charged in the wire fraud count is unaffected by <u>Skilling</u> and <u>Black</u>. According to the United States, contrary to Petitioner's assertions, property fraud was charged in the indictment.[3] (ECF

---

[3] The United States distinguishes this case from <u>Mandel</u>, because in <u>Mandel</u> there was no alternative property fraud theory, as there is here. (ECF No. 109, p. 8.)

No. 109, p. 6.)  The United States, relying on Carpenter, avers that the property allegedly defrauded by Petitioner, confidential information relating to certain corporate stock prices, constitutes property within the meaning of the mail and wire fraud statutes. The United States distinguishes Skilling and Black from Carpenter, arguing that the former address the need for an honest services theory to include bribery or kickbacks, while neither addressed or purported to draw a distinction between tangible and intangible property rights.  (ECF No. 109, p. 8.)

Next, the United States argues that because Petitioner did not raise a vagueness claim on direct appeal, he must demonstrate that he is actually innocent of all charges to obtain coram nobis relief.  (ECF No. 109, p. 9.)  Petitioner points out that in fact, on direct appeal, the Fourth Circuit explicitly acknowledged that Claimant did not raise a vagueness argument.  (ECF No. 109, p. 10) (citing ReBrook, 58 F.3d at 967 n.7).  As a result, pursuant to United States v. Osser, 864 F.2d 1056, 1060-61 (3d Cir. 1988), coram nobis review is conducted under an even stricter standard. (ECF No. 109, p. 9.)  Because Petitioner did not raise this argument on direct appeal, he may raise it here on collateral appeal only by showing both "cause" and "actual prejudice" or that he is "actually innocent."  (ECF No. 109, p. 11) (quoting Murray v. Carrier, 477 U.S. 478, 496, 503 (1986)).

The United States argues that while cause may be shown where

a question is "'so novel'" that its legal basis is not "'reasonably available'", Petitioner cannot show cause for his failure to raise it on direct appeal since he raised the vagueness challenge to § 1346 before the trial court. (ECF No. 109, p. 12) (quoting <u>Reed v. Ross</u>, 468 U.S. 1, 16 (1984)).

Thus, Petitioner must show that he is actually innocent of either theory charged in the complaint. (ECF No. 109, p. 12.)  In light of <u>O'Hagan</u>, the securities fraud count is a valid charge. Furthermore,

> [t]he only breach of the defendant's duty that is alleged in the "honest services" prong of the count is the defrauding of the State and the Lottery of the confidential information that is the object of the "property" fraud theory of that count.  That is, defendant breached his duty of "honest services" precisely by misappropriating the confidential information that is the basis for the property theory charged in Count One.  Thus, unless the jury had been convinced that defendant had defrauded the State and the Lottery of this confidential information, they could not have found him guilty of Count One under either theory charged.

(ECF No. 109, p. 14.)  The United States makes a similar argument related to Count Two, i.e., that the securities fraud scheme charged in Count Two is the same scheme as charged in Count One. The jury could not have found Petitioner guilty of Count Two unless they had agreed that he had defrauded the State and the Lottery of the confidential information that is charged in the property fraud theory of Count One. (ECF No. 109, p. 15.)

The United States argues that even if Petitioner were not in

procedural default, he should not be granted relief under a writ of error coram nobis because there is a high probability that the jury convicted him under the valid property fraud theory charged in Count One.  According to the United States, the jury could not have convicted Petitioner of Count One, even under an "honest services" theory, unless they found that he had defrauded the State of property.  (ECF No. 109, p. 17-18.)  Likewise, the jury could not have convicted Petitioner on Count Two unless they had found that Petitioner defrauded the State of property as charged under the property theory in Count One.  (ECF No. 109, pp. 18-19.)

In reply, Petitioner takes issue with the assertion of the United States that he did not timely comply with the procedural requirements of seeking a writ of error coram nobis because he did not raise the vagueness issue in his appeal to the Fourth Circuit. Petitioner points out that the change in the law under Skilling has been found to be so significant that the Third Circuit has retroactively applied this holding in a case where the defendant failed to raise the vagueness argument at trial.  Petitioner asserts that he clearly challenged the constitutionality of the honest services wire fraud count prior to trial on vagueness grounds, but Judge Haden was dismissive of this argument and reaffirmed it after Petitioner was convicted.  On appeal, Petitioner argued that the securities fraud and wire fraud convictions were so intertwined that the insufficiency of the

11

evidence on the securities fraud claim necessarily required the reversal of the wire fraud claim as well.  However, the Fourth Circuit concluded that while the securities fraud conviction had to be vacated because the Fourth Circuit rejected the misappropriation theory, the honest services wire fraud conviction could and would be affirmed.[4]  (ECF No. 110, p. 4.)  Thus, the Fourth Circuit did not address the constitutionality of Petitioner's honest services wire fraud conviction because this specific issue was not raised in the appeal.  (ECF No. 110, p. 4.)  Petitioner points out the acknowledgment of the United States that the Fourth Circuit has not decided a case setting forth the procedural prerequisites which must be met before coram nobis relief is available.  (ECF No. 110, p. 5.)  Petitioner submits a review of Fourth Circuit decisions, including Mandel and others, suggests that the Fourth Circuit has been more concerned with addressing the fundamental unfairness of a person remaining convicted of a crime when, under the law as expressed in a more recent decision, the person is actually innocent of the crime.  (ECF No. 110, p. 5.)

Petitioner argues that the chances that the honest services wire fraud body of law was going to be altered on appeal was

---

[4]  Regarding O'Hagan and its effect, Petitioner avers that it was decided in 1997, two years after the Fourth Circuit set aside the Petitioner's securities fraud conviction and affirmed the honest services wire fraud conviction.  According to Petitioner, "[t]his change in the law, criminalizing conduct previously held by the Fourth Circuit as well as many other courts as not being criminal, has no relevance or application in this coram nobis proceeding."  (ECF No. 110, p. 4 n.1.)

unlikely, particularly given the fact that 18 U.S.C. § 1346 was enacted by Congress in response to the holding in <u>McNally</u>. Petitioner asserts that on appeal, he

> chose not to raise a constitutional challenge to the validity of the honest services wire fraud conviction because, based upon the existing law, Petitioner's counsel was convinced the securities fraud conviction could not be separated from the wire fraud conviction, and he was convinced the securities fraud conviction would be set aside, which it was.

(ECF No. 110, p. 10.) Finally, Petitioner distinguishes <u>Osser</u> because the defendant in that case was convicted on multiple counts of mail fraud, based upon several theories, including an allegation that he received kickbacks and bribes. In comparison, Petitioner asserts that in the instant case he was convicted of wire fraud only on the honest services theory. Finally, unlike Petitioner, the defendant in <u>Osser</u> failed to preserve the <u>McNally</u> issue at trial or on appeal. (ECF No. 110, p. 11.)

Next, Petitioner argues that his wire fraud conviction was affirmed by the Fourth Circuit only based upon the United States' honest services theory. According to Petitioner, "[a]n examination of the instructions given to the jury, the District Court's decisions, and the Fourth Circuit's decision clearly demonstrates Petitioner was convicted only of honest services wire fraud." (ECF No. 110, p. 12.) Petitioner contends that the first time the United States suggested that it also prosecuted Petitioner on a property theory of wire fraud was in the brief filed on October 7,

13

2010, in response to Petitioner's Petition. (ECF No. 110, p. 14.)

Finally, regarding the United States' argument that the jury could not have convicted Petitioner on the honest services portion of the wire fraud count or the securities fraud count without finding a deprivation of property, Petitioner argues that

> [t]he jury never was instructed on a property theory of wire fraud, the District Court never addressed any property wire fraud theory in any of its orders, and the Fourth Circuit only affirmed the honest services wire fraud conviction. Furthermore, to state the obvious again, the Fourth Circuit vacated the securities fraud conviction as a matter of law.

(ECF No. 110, p. 15.)

In his supplemental brief, Petitioner addressed the issue of whether he had procedurally defaulted by failing to challenge his honest services wire fraud conviction below. Petitioner points out that he lacks copies of certain critical briefs, including those filed with the Fourth Circuit and the Supreme Court. In particular, Petitioner argues that the Fourth Circuit's docket sheet shows that he filed a petition for rehearing with a suggestion for rehearing en banc, and although counsel has not seen the final version of that document, an electronic version includes a detailed argument challenging the validity of his honest services wire fraud conviction. This petition for rehearing was denied. (ECF No. 117, pp. 2-3.)

In his petition for a writ of certiorari with the Supreme Court, which counsel states he has reviewed but does not know

whether it was filed, Petitioner challenged the unconstitutional
vagueness of honest services mail and wire fraud. (ECF No. 117,
p. 3.)

In any event, Petitioner argues that because the Court in
Skilling construed § 1346, rather than finding it
unconstitutionally vague, any appeal where the construction of the
statute was challenged should be sufficient to permit a person to
collaterally attack a prior honest services wire fraud conviction
where there is no evidence of bribes or kickbacks. (ECF No. 117,
pp. 5-6.) Petitioner asserts that he challenged the validity of
his honest services wire fraud conviction in his appeal to the
Fourth Circuit. (ECF No. 117, p. 6.) Petitioner asserts that he
had also preserved the issue at the District Court level through
multiple challenges to the validity of his honest services wire
fraud conviction. (ECF No. 117, p. 7.)

Petitioner concedes that the Fourth Circuit's notation in
footnote 7 of ReBrook, 58 F.3d at 967, that Petitioner did not
challenge § 1346 as being unconstitutionally vague is troubling
from a procedural default point of view. However, Petitioner
asserts that he did challenge the validity of the honest services
wire fraud conviction before the Fourth Circuit, and believes he
may have challenged the conviction in more detail in his petition
for rehearing and suggestion for rehearing en banc as well as his
petition for a writ of certiorari filed with the Supreme Court.

(ECF No. 117, p. 9.)

Assuming the court finds that Petitioner has not procedurally defaulted, Petitioner asserts that Skilling is controlling and mandates coram nobis relief in this case.  Petitioner was convicted of committing acts – depriving the public of honest services – which acts the Supreme Court has determined are not criminal. Regarding the theory of the United States that the jury had the option of convicting Petitioner on a theory that he had committed wire fraud to obtain money or property from the person or entity so deceived, Petitioner points out that other than brief reference in the instructions, the jury was not otherwise given any instructions further defining any money or property allegedly involved in Petitioner's scheme or artifice to defraud.  Instead, the sole focus in Petitioner's case was that he was guilty of honest services wire fraud.  (ECF No. 117, pp. 10-11.)

Finally, Petitioner relies on cases cited in his reply brief in which, despite a variety of procedural defenses asserted by the United States, coram nobis relief was granted.  Petitioner acknowledges, as the court pointed out at the hearing on this matter, that these cases were decided prior to Bousley v. United States, 523 U.S. 614 (1998).  Petitioner argues the he meets the standard established in Bousley, that he is actually innocent. Under Skilling, Petitioner asserts that he is actually innocent of honest services wire fraud, as the United States has conceded that

16

he received no bribes or kickbacks.  (ECF No. 117, pp. 13-14.)

In response, the United States argues that on direct appeal, Petitioner's entire argument challenging the validity of his wire fraud conviction was based on his contention that the count was based on an invalid insider-trading securities fraud theory.  The United States asserts that Petitioner did not argue that the statute was unconstitutionally vague, as is evidenced by the Fourth Circuit's statement in its decision at footnote 7. (ECF No.  120, pp. 1-2.)

Regarding the petition for rehearing, the United States attaches a copy to its brief and argues that it does not contain any argument challenging the constitutionality of the wire fraud statute and instead, argues that the mail fraud conviction was infirm because it was based on the purportedly flawed securities-fraud, insider trading theory. (ECF No. 120, pp. 2-3.)  The United States argues that in any event, there is considerable authority that raising the constitutionality argument for the first time in a petition for rehearing is not sufficient to preserve the issue. (ECF No. 120, p. 3.)

The United States avers that Petitioner concedes he cannot show cause for any default and that he also cannot show by clear and convincing evidence that he is actually innocent of the crimes of conviction and factually innocent of all charges that were available to the prosecution at the time of indictment.  (ECF No.

120, p. 3.)  The United States points out that the jury found Petitioner guilty of the securities fraud count (Count Two), and even though this conviction was reversed, the Supreme Court later overruled the <u>Bryan</u> case on which the reversal was based, holding that the theory of prosecution the government employed here was, in fact, valid.  (ECF No. 120, p. 4.)

The United States argues that Petitioner makes no effort to defend himself factually on the securities fraud charge.  Because Petitioner is guilty under the securities fraud count, under <u>Bousley</u>, inquiry in this coram nobis case ends.  (ECF No. 120, p. 4.)

The United States disputes Petitioner's argument that because <u>Skilling</u> did not completely invalidate § 1346, any argument he made appealing his wire fraud conviction should suffice.  The United States notes that Petitioner cites no authority for the argument that a "generic" challenge of a particular conviction ought to preserve particular arguments that were not made, that Petitioner's challenge to the mail fraud conviction was not a challenge to the construction of § 1346 and that although <u>Skilling</u> did not completely invalidate § 1346, the aspect of the statute that was struck down was voided on vagueness grounds and Petitioner was undeniably aware of it at the time of his direct appeal.  (ECF No. 120, p. 5.)

The United States further asserts that Petitioner ignores in

his brief that the mail fraud charge alleged an alternative property fraud theory. Because alternative theories were charged, the case is to be reviewed under the harmless error standard applied in Hedgpeth v. Pulido, 555 U.S. 57 (2008). Confidential, insider information is in fact property, and the wrongful appropriation of this information may, indeed constitute mail or wire fraud pursuant to Carpenter, 484 U.S. at 25. The United States argues that the jury found facts sufficient to satisfy the elements of the valid Carpenter-property fraud theory, since the only fraudulent acts alleged in the count or proven at trial are those that satisfy the Carpenter test. (ECF No. 120, p. 9.) "That is, [Petitioner] was charged with defrauding the State of his honest services solely and exclusively by fraudulently appropriating property - that is, confidential, inside information relating to the value of certain stocks - to his own use. No other fraudulent acts were alleged or proven." (ECF No. 120, p. 9.)

Finally, the United States argues that Petitioner's continued reliance on Mandel is misplaced. The indictment in Mandel contained no alternative property fraud theory in the charge and retains little precedential value. (ECF No. 120, pp. 12-13.)

19

Facts

A.   The Charges.

On June 17, 1993, a two-count indictment was filed against Petitioner alleging wire fraud and securities fraud.

Count One alleged that Petitioner did knowingly devise a scheme and artifice (the "scheme")

a.   To defraud the State of West Virginia, the West Virginia Lottery, and the citizens of the State of West Virginia of his honest and faithful services as an employee, that is, the attorney for the West Virginia Lottery; and

b.   To defraud the State of West Virginia and the West Virginia Lottery of certain property, that being certain confidential nonpublic information.

(ECF No. 109-1, p. 5.)   The United States alleged that for the purpose of executing the scheme, Petitioner transmitted and caused to be transmitted in interstate commerce certain signals causing recording, and indicating certain orders by means of a wire communication, all in violation of 18 U.S.C. §§ 1343 and 1346. (ECF No. 109-1, p. 12.)

Count Two realleged the allegations contained in Count One and incorporated them.   Count Two further alleged that Petitioner owed the West Virginia Lottery, the State of West Virginia and its citizens "a general duty of loyalty, honesty, independence, impartiality, and integrity and was under a specific legal duty to refrain from using confidential nonpublic information gained in the course of his official duties for his own personal benefit or the

20

benefit of others." (ECF No. 109-1, p. 13.) Count Two alleged that Petitioner knowingly possessed stolen, confidential, material, nonpublic information that he acquired in his official duties as the attorney for the West Virginia Lottery and in turn, purchased through the facilities of interstate commerce 100 shares of VLC stock under stock symbol "VLTS," in violation of 15 U.S.C. §§ 78ff and 78j(b) and 17 U.S.C. § 240.10b-5. (ECF No. 109-1, pp. 13-14.)

B.  District Court Decisions.

Prior to trial, Judge Haden denied two motions to dismiss filed by Petitioner. (# 39.) In <u>United States v. ReBrook</u>, 837 F. Supp. 162 (S.D. W. Va. 1993), Judge Haden found the indictment properly charged offenses of insider trading under a misappropriation theory and wire fraud. For purposes of the wire fraud statute, Petitioner had a duty to provide honest service and honest service used in the wire fraud statute was not unconstitutionally vague.

Of note, Judge Haden observed in <u>ReBrook</u> that

The indictment also charges Defendant with wire fraud. To establish the offense of wire fraud, the Government must prove Defendant knowingly devised or intended to devise a scheme or artifice to defraud, and that in furtherance of that scheme or artifice, he transmitted or caused to be transmitted by means of wire, radio or television communication in interstate commerce any writings, signs, signals, pictures, or sounds. 18 U.S.C. § 1343. The term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right to honest services. 18 U.S.C. § 1346.

The indictment here relies on the same factual predicate for both the charges of insider trading and

21

wire fraud. The Government charges the Defendant with devising a scheme to defraud the State of West Virginia, its citizenry, and the Lottery of Defendant's honest and faithful services as Lottery attorney by misappropriating and utilizing confidential nonpublic information regarding an alleged plan to expand video lottery in West Virginia. The indictment also accuses Defendant of trading in and tipping others to trade in VLC stock based on the confidential information.

ReBrook, 837 F. Supp. at 167.

    C.  Trial.

        1.  Opening Statement.

In its opening statement, the United States stated that Petitioner was charged with "using confidential information that he gained in the course of his employment with the West Virginia Lottery to buy stock in a gambling company ...." (# 83, p. 83.) The United States explained that "[i]t is simply common sense that every employee, whether he is a lawyer or not and whether he is a public employee or an employee of a private company, owes his employer a duty of honest services and included within that duty, as this evidence will show, is the specific duty to refrain from using confidential information." (# 83, p. 84.) Indeed, the United States asserted that "[t]his case is about the misuse of confidential information and the failure of an employee to render his employer his honest and faithful services." (# 83, p. 86.)

The United States further stated that

There are two counts in this case and the [Petitioner's] stock purchase is unlawful in two ways. First in buying the stock the [Petitioner] was using confidential information gained in the course of his employment for

22

his own benefit.  Thus in making that wrongful use of his
confidential information, the [Petitioner] defrauded his
employer of what he owed his employer, which was his
honesty, his honest services.   Second, count 2, it's
simply against the law to make stock purchases based on
insider information you've gotten through a relationship
of trust.

When the defendant made his purchase armed with the
knowledge  that  video  lottery  was  going  to  expand
throughout the state right after the November election,
that this expansion would give a single company exclusive
rights, that VLC was the favorite to win that contract,
and that the chief executive had made certain assurances
about the continued health of that company, he acted on
information  which  was  not  available  to  the  general
investing  public.   That's  the  definition  of  insider
trading. *** After he bought shares of [VLC], he acted to
make sure that everything went as planned.   After the
defendant became an owner of [VLC] stock, he continued to
function  as  lottery  counsel.   And  in  that  role  he
continued  to  play  a  part  in  the  movement  toward  the
expansion of video lottery.  That expansion, of course,
was  something  that  would  have  made  a  lot  of  money  for
[VLC],  a  company  defendant  now  owned  stock  in.   The
defendant knew that, the evidence will show, because he
knew that the director favored VLC and that the director
had made that favoritism known to the people who would be
doing the decision – his subordinates, people who worked
for him.

(# 83, pp. 93-95.)

        2.   Evidence at Trial - United States.

            a.   Robert Babcock.

At  trial,  the  United  States  called  Robert  Babcock  of  Video

Lottery  Technology  ("VLT"),  of  which  VLC  is  a  wholly  owned

subsidiary.   VLT[5]  manufactured  video  lottery  terminals  and  central

communication systems for those terminals.  (# 83, p. 108-09.)  In

_____

        [5]  Throughout  the  trial,  the  terms  "VLTC,"  "VLT"  and  "VLC"  were  used
interchangeably, and the court has done so herein as well.

1990, VLC had a test program in West Virginia at Mountaineer Park involving approximately 100 terminals. (# 83, p. 111.) Mr. Babcock met with Butch Bryan in 1991 to discuss a video lottery program for West Virginia at Mountaineer Park. Mr. Babcock testified on cross examination that Petitioner was not present at this meeting. (# 83, p. 138.) Mr. Babcock's company was interested in "pursuing whether or not the lottery was looking forward to going ... statewide [with] the video lottery program." (# 83, p. 113.) In the summer of 1991, Mr. Babcock learned of a public opinion poll that indicated public sentiment was not supportive of video lottery. (# 83, p. 116.)

Mr. Babcock testified that he met with the Governor of West Virginia regarding video lottery. At the first meeting, Governor Caperton "indicated to me that he would not have it expanded in West Virginia until and if he was reelected in ... November of 1992, at which point he would become a strong proponent of a video lottery program. But until then, no." (# 83, p. 118.)

At a second meeting, Larry Lippon, CEO of VLC, Tom Heywood, then Governor Caperton's chief of staff, and others were in attendance. Mr. Babcock testified that Mr. Lippon made a proposal that VLC could "open up a manufacturing facility in West Virginia." (# 83, p. 122.) This agreement was reduced to writing and provided that VLC be the sole source provider of the terminals and the central system in West Virginia. (# 83, pp. 122, 124.) It also

24

contained a proposal that VLT would build a plant in West Virginia. (# 83, p. 126.)  Mr. Babcock testified that Butch Bryan insisted upon two major changes; that the sale be competitively bid out and not just provided by VLC to the State and that the Amusement and Music Operator's Association buy the terminals from VLC and place them in retail establishments themselves.  (# 83, p. 125.)  Mr. Babcock testified on cross examination that Petitioner was not present at either meeting with the Governor.  (# 83, p. 139.)

Mr. Babcock testified that Mr. Bryan and Bill Woodford, the director of security for the Lottery visited VLT headquarters in Bozeman, Montana in August of 1992.  (# 83, pp. 125-26.)  Also, in late August of 1992, Mr. Bryan asked Mr. Babcock to fly into Clarksburg, West Virginia to view a number of sites in West Virginia that were attractive plant locations.  (# 83, pp. 126-27.)  When asked if the company eventually chose a couple of sites that would be suitable, Mr. Babcock responded in the affirmative and stated that "[i]n Beelington [sic; Belington] and Glenville ... two sites [were] proposed in response to an RFP [request for proposal] that was put out by the lottery."  (# 83, p. 127.)

Mr. Babcock testified that the next day, Mr. Bryan conducted two meetings, one at the Marriott and one at the lottery.  At the Marriott, Mr. Babcock and Mr. Bryan discussed the lottery program, how many terminals per location and the kinds of bets and games that should be authorized to be played.  (# 83, p. 127.)  Mr.

25

Babcock testified that the meeting at the Marriott was very helpful in preparing VLT's RFP regarding expansion of video lottery in West Virginia, which RFP eventually was filed on December 4, 1992. (# 83, pp. 129, 136.)  Mr. Babcock testified on cross examination that Petitioner was not present at these meetings and that he had only met Petitioner casually two times at dinner when he was sitting at someone else's table.  Mr. Babcock never discussed with Petitioner the matters about which he testified. (# 83, pp. 138, 140.)

On September 23, 1992, Mr. Babcock received a call from Mr. Bryan and learned that there was a drastic drop in the stock price of VLT because "Australia had essentially ... removed us from the rolls, which prohibited us from doing any new business with them." (# 83, pp. 134-35, 141.)

b.   Bernard J. Folio.

Bernard J. Folio testified that he was an executive with Explosives, Incorporated, Central Distributing, Incorporated and Mid-City Land, Incorporated and lived in Clarksburg, West Virginia. (# 83, p. 147.)  On February 15, 1992, during Petitioner's run for Attorney General for the State of West Virginia, Petitioner visited Mr. Folio at his residence to solicit a campaign donation, and Mr. Folio recorded the conversation. (# 83, pp. 147-48.)

During the conversation, Petitioner asked Mr. Folio if he had any "machine involvement" anywhere, and Mr. Folio testified that he had an inactive machine company. (# 83, p. 165.)  Petitioner then

26

stated

> Well, you can keep this under your - - it's not secret, because every machine operator in West Virginia knows this, so I'm not talking out of school, but it's not something you want to make public statements about.

> Caperton is going to allow the Lottery Commission, as soon as the general election is over, to go full speed ahead with the video lottery, full speed ahead.

(# 83, p. 165.)   Petitioner told Mr. Folio that the Lottery Commission intended to take over all gambling in West Virginia.   (# 83, p. 173.)   Petitioner told him that the coin operators had cut a deal to be involved in the expansion, that machines were going to be placed in all four racetracks, the Greenbrier Hotel and other establishments in West Virginia, that the Lottery Commission planned to take over bingo in West Virginia and that pull tabs were going to be legalized and taken over by the Lottery Commission.   (# 83, pp. 167-68, 172.)

Mr. Folio agreed to serve on Petitioner's campaign committee and gave him a campaign contribution.   (# 83, p. 182; # 84, p. 215.)

On cross examination, Mr. Folio testified that in 1992, after his conversation with Petitioner, he activated his membership in the Music and Vending Machine Association.   (# 83, p. 214.)   When he became a member, he learned that video lottery was going to be expanded after the election.   (# 83, p. 217.)

        c.   Elton Bryan.

Elton E. "Butch" Bryan[6], former Lottery Director for the State of West Virginia from 1990 to early 1993, testified that he was appointed Lottery Director by then Governor Gaston Caperton on February 5, 1993.  (# 84, pp. 223, 226.)  Mr. Bryan had known Petitioner for several years and worked with him in another State agency. (# 84, pp. 224-25.)  Mr. Bryan recommended that Petitioner be hired as counsel to the Lottery Commission.  The position was part-time, and Petitioner earned approximately $21,000.00 per year. (# 84, p. 226.)  His duties included advising the Lottery Commission and Mr. Bryan and overseeing the drafting of documents. (# 84, p. 226.)

Mr. Bryan testified that video lottery machines were first installed in West Virginia in 1990 at Mountaineer Park in Chester, West Virginia as a research and development center for the possibility of statewide expansion of video lottery.  (# 84, pp. 228-29.)  Mr. Bryan assigned Petitioner the task of conferring with Mr. Woodford, who was preparing the RFP for video lottery for West Virginia.  (# 84, p. 230.)  Mr. Bryan testified that he told Petitioner that the Governor was "interested in the program and it was one of the reasons I was sent over there to develop it."  (# 84, p. 232.)  Mr. Bryan stated that he and Petitioner reported to the Governor in the fall of 1990 regarding the progress his

---

[6]  Mr. Bryan testified that he was convicted of a felony in September 1993, related to charges of perjury, wire fraud, mail fraud and insider trading, and was testifying under an immunity agreement.  (# 84, pp. 227, 255.)

28

department was making in the move toward statewide expansion of
video lottery.  (# 84, p. 233.)

Regarding a time table for state-wide expansion of the
lottery, Mr. Bryan testified that he told Petitioner that "the
Governor wanted us to as quickly as possible develop the program
and have it ready to go."  (# 84, p. 235.) When asked if Mr. Bryan
talked to Petitioner about when the program would probably go, Mr.
Bryan responded that "we talked about on many occasions that it was
an assumption on most of our parts that it probably wouldn't begin
until after the election" and that he informed Petitioner that this
information came from the administration.  (# 84, p. 235.)

Mr. Bryan visited VLC in Bozeman, Montana and advised
Petitioner that it was the best company to develop the program in
West Virginia, particularly because they offered to build a plant
in West Virginia.  (# 84, pp. 239-40.)  Under the RFP proposal for
VLC, of which Petitioner was aware, VLC would build a plant in West
Virginia in exchange for a sole source contract in West Virginia.
(# 84, pp. 240-41.)

Mr. Bryan described Petitioner's role in the RFP process.
After an RFP is developed at the lottery and reviewed by the
deputies, Petitioner and Mr. Bryan, it is sent to the Department of
Finance and Administration.  (# 84, p. 244.)  The RFP is then sent
to interested parties, in this case, other gaming machine
companies.  The company receiving the RFP prepares an answer to the

questions which are in the RFP, returns them to Finance and Administration, and in turn, these documents are turned over to the Lottery Commission.   (# 84, p. 245.)   With respect to this particular RFP, Mr. Bryan had informed individuals at the Lottery Commission involved with evaluating the RFP that he preferred VLT, including Petitioner.  (# 84, p. 246.)

In mid-September of 1992, Mr. Bryan testified that the stock in VLTC, the holding company for VLC and VLT, dropped dramatically. (# 84, p. 247.)  Mr. Bryan informed Petitioner of this dramatic drop from $35.00 per share to $14.50 per share.  (# 84, p. 248.) Mr. Bryan inquired of VLC regarding the drop in share price, and learned from Mr. Larry Lippon, chief executive officer of the company, that the worst was over and things were going to be all right.  (# 84, pp. 250, 276.)  That day, Mr. Bryan purchased 300 shares of stock in the company.  (# 84, pp. 250-51.)  Mr. Bryan testified that Petitioner and Mr. Moran, manager for G-Tech[7] online services at the lottery, had a conversation related to what Mr. Lippon related to Mr. Bryan about the VLC stock.  (# 84, pp. 251, 270.)  Mr. Moran told Petitioner that "he thought the health of the company was going fine and Mr. Moran was advising Mr. ReBrook to buy, go and get some of that stock."  (# 84, p. 252.)  Petitioner advised Mr. Bryan on or about September 21st or 22nd that he had

---

[7]  G-Tech had a sole source contract at Mountaineer Park.  (# 84, p. 270.)

30

purchased 100 shares of stock in the company. (# 84, p. 252.)

On cross examination, Mr. Bryan testified that Petitioner looked into matters involving legal questions, but had no control over policy matters. (# 84, p. 258.) Petitioner prepared documents as requested by Mr. Bryan and reviewed them but made few changes. (# 84, pp. 258-59.) Regarding the RFP, Petitioner helped with the "legal structure" of it, but not the content. (# 84, p. 259.)

Mr. Bryan admitted that before the grand jury he testified that in his discussions with Governor Caperton, no time tables were set for statewide video lottery proceedings, though the consensus was it would be after the election. (# 84, pp. 262-63.)

On redirect, Mr. Bryan testified that the administration had done a poll that indicated voters did not want video lottery and, as a result, the plan to delay video lottery until after the election was a secret. (# 84, p. 276.)

d.   James Moran.

Mr. Moran testified that he was employed since 1992 by G-Tech, a computer company whose offices were located in the same building as the West Virginia Lottery. (# 84, p. 279.) In September of 1992, Mr. Moran watched the price of VLC stock drop drastically and discussed this with Mr. Bryan, Petitioner and Mr. Woodford. (# 84, p. 281.) On the afternoon the stock dropped, he heard Mr. Bryan engaged in two phone conversations with VLC officials. (# 84, p.

283.)  Mr. Moran witnessed a conversation, at which Petitioner was present recounting the content of these phone calls, i.e., that Mr. Lippon stated the stock had dropped because of a problem in Australia and it was probably as low as it was going to go.  (# 84, pp. 284-85.)  As a result, Mr. Moran purchased 100 shares of stock on September 23, 1992.  (# 84, pp. 283, 285.)

On cross examination, Mr. Moran testified that he was unsure whether Petitioner was present when the telephone calls took place, but that later on he was present when a conversation with Petitioner occurred and he told Petitioner that he had purchased stock.  (# 84, pp. 286-87.)  Mr. Moran "may have" been the one who told Petitioner about the phone conversation between Mr. Lippon and Mr. Bryan.  (# 84, p. 287.)  Mr. Moran was present during Mr. Bryan's phone call with Mr. Lippon, and Mr. Bryan did not tell Mr. Moran to keep the information he learned during the phone call a secret.  (# 84, p. 289.)

   e.   John Paul Casto.

Mr. Casto testified that he worked as a stockbroker and was once Petitioner's neighbor.  (# 84, pp. 292-93.)  On September 24, 1992, Petitioner called Mr. Casto at work and asked if he could visit Mr. Casto.  (# 84, p. 295.)  The purpose of Petitioner's visit was to purchase 100 shares of stock in VLT.  (# 84, pp. 295-96.)  The time stamped on the order ticket is 3:42.  (# 84, p. 298.)

f.  J.K. Thomas.

Mr. Thomas testified that he had known Petitioner for fifteen years and considered him a friend. (# 84, p. 304.) In January of 1993, Mr. Thomas purchased 2,000 shares of VLT stock after first hearing about the stock from Petitioner. (# 84, pp. 305, 307-08.) Mr. Thomas testified that on November 25, 1992, the Petitioner "stopped and wrote down on a napkin, VLTS and said, 'You're a stock man, watch this stock. Some day it might be a good one.'" (# 84, p. 306.)

On cross examination, Mr. Thomas testified that he did not purchase the stock based upon what Petitioner had told him. Petitioner only made him aware of the stock. Petitioner did not tell Mr. Thomas that the Lottery Commission was getting ready to do anything in reference to VLT. (# 84, p. 310.) When asked why he waited until January to purchase the stock, Mr. Thomas testified that he read an article on the front page of the Charleston Gazette talking about the two companies that were going to bid on the lottery, VLTS and IGT. (# 84, p. 311.)

On redirect, Mr. Thomas testified that after writing on the napkin, Petitioner "said something like it's a lottery machine or lottery company or something like that." (# 84, p. 314.) Mr. Moran testified that the fact that Petitioner was a lottery lawyer and Mr. Moran knew the lottery was thinking about going to video lottery had nothing to do with his purchase other than making him

33

aware of the stock.  Mr. Moran confirmed that IGT and VLC were the two companies listed in the newspaper, that Petitioner recommended one of these companies and that was the one he bought.  (# 84, p. 315.)

g.  C. Donald Robertson.

Mr. Robertson testified that he was a close friend of Petitioner. (# 84, p. 317.)  On September 24, 1992, Mr. Robertson purchased 2000 shares of VLTS stock after Petitioner told him and others that Mr. Moran had told Petitioner it was a good buy. Petitioner also told Mr. Robertson that he had purchased 100 shares of stock.  (# 84, pp. 318-20.)

On cross examination, Mr. Robertson confirmed that he actually purchased the stock on September 25, 1992.  (# 84, p. 325.) Mr. Robertson testified that he bought the stock based on his own evaluation, not based on what Petitioner told him. (# 84, p. 326.)

h.  Anthony Giambrone.

Mr. Giambrone testified that he served on the State Lottery Commission and at the time of trial, was the chairman.  (# 84, p. 332.)  Mr. Giambrone relied on Petitioner for legal advice related to Lottery Commission matters.  (# 84, p. 332.)  At a Lottery Commission meeting on August 24, 1992, with Petitioner in attendance, Mr. Giambrone made a motion to have a subcommittee study video lottery.  The motion passed.  (# 84, pp. 336-37.)

On September 28, 1992, at a Lottery Commission meeting with

34

Petitioner in attendance, Mr. Giambrone made a comment at the request of Petitioner. Mr. Giambrone "said that the experience – – something about the experience and the changing technology was happening at Mountaineer Park." (# 84, p. 338.) Mr. Giambrone did not know at the time that Petitioner owned stock in VLC.

On October 26, 1992, at a Lottery Commission meeting with Petitioner in attendance, Mr. Giambrone asked the director, Mr. Bryan, a list of questions he received from Petitioner. Mr. Giambrone did not know at the time that Petitioner owned stock in VLC. (# 84, p. 339.)

At a Lottery Commission meeting on November 30, 1992, Mr. Giambrone read a report from the subcommittee studying video lottery, which stated that "the committee carefully studied the Mountaineer Park video lottery experience," but Mr. Giambrone admitted that the committee never formally met to study the Mountaineer Park experience. The report also states that data was selected by the committee on the Mountaineer Park experience and that a projected annual revenue of this project was 50 million dollars, but, according to Mr. Giambrone, the subcommittee did not collect any data from Mountaineer Park during that period of time. (# 84, p. 341.) Instead, Mr. Giambrone got this report from Petitioner, whom he witnessed directing its preparation. (# 84, p. 342.) According to Mr. Giambrone, the purpose of this report was to advance video lottery. At that time, Mr. Giambrone did not know

35

that Petitioner owned stock in VLC.  (# 84, p. 343.)

On cross examination, Mr. Giambrone admitted that he saw Petitioner scribbling on the report, but did not actually see him dictating or preparing the report.  Mr. Giambrone conceded that Petitioner could have been editing someone else's work.  (# 84, pp. 345-46.)  Mr. Giambrone admitted that he did not know who wrote the questions handed to him by Petitioner, but that "[h]e asked me to ask Butch the questions and Butch would have the answers."  (# 84, pp. 349-50.)

3.  Evidence at Trial - Petitioner.

a.  William Edward Woodford.

Mr. Woodford testified that he was the chief of security and computer services at the West Virginia Lottery Commission.  (# 84, p. 361.)  At the request of Mr. Bryan, Mr. Woodford worked on the RFP request for video lottery in the latter part of 1992.  (# 84, p. 363.)  The RFP was approximately 30 pages long.  According to Mr. Woodford, Petitioner had nothing to do with the formation of the RFP.  (# 84, p. 364.)  Mr. Woodford testified that he traveled to Montana with Mr. Bryan to investigate video lottery.  (# 84, p. 366.)

Mr. Woodford attended a meeting at the Marriott on September 1, 1992, which was attended by Mr. Bryan and individuals from VLC. (# 84, p. 368.)  Petitioner was not at this meeting.  (# 84, p. 369.)

36

On cross examination, Mr. Woodford admitted that Petitioner did not work for him and that Petitioner answered only to the director, Mr. Bryan.  (# 84, p. 373.)  Mr. Woodford conceded that he did not know everything that Mr. Bryan told Petitioner to do. (# 84, p. 374.)

> b.  Leoma Ballard.

Ms. Ballard was the executive secretary of the West Virginia Music and Vending Association, a trade association of owners and operators of coin operated machines, vending and amusement.  (# 84, pp. 374-75.)  Ms. Ballard read articles in the newspaper from which she learned that video lottery would be expanded throughout the state, though not at a set time.  (# 84, p. 378.)

> c.  Charles Steven Hyre.

Mr. Hyre testified that he had been a member of the West Virginia Lottery Commission since 1990.  Mr. Hyre was aware of an evaluation committee put together with respect to the proposed expansion of video lottery throughout West Virginia in the latter part of 1992.  (# 84, p. 380-81.)  Mr. Hyre explained that the purpose of the committee was to "go through the proposals, of which there were two, that we received, two different companies regarding what they were offering in response to an RFP that we had put out to bring  - - to actually sell these machines or bring these machines to the people who would use them in the State of West Virginia."  (# 84, p. 381.)

37

When asked if the evaluation committee report was ever given to the Lottery Commission or whether there was any secret plan in reference to the evaluation committee or their findings, Mr. Hyre responded in the negative. (# 84, p. 382.) The Lottery Commission voted in favor of the expansion. (# 84, pp. 382-83.)

On cross examination, the United States asked Mr. Hyre if there was a secret plan with regard to the bid process, if it was a secret from him too, to which Mr. Hyre responded in the affirmative. (# 84, pp. 834-85.) When asked: "you did not know that the director had gone to his deputies on the evaluation committee and told them that he wanted a particular company to win that contract, did you?," Mr. Hyre responded in the negative. (# 84, pp. 386-87.)

> d.  Gaston Caperton.

Then Governor Gaston Caperton testified that he was aware of the Lottery Commission's interest in video lottery, but that he did not have a plan to implement statewide video lottery after the general election of 1992. (# 85, p. 420.) Governor Caperton testified that he never told Petitioner that he had a plan to implement statewide video lottery after the general election of 1992. (# 85, p. 421.)

On cross examination, Governor Caperton testified that the press came to him after Mr. Bryan's trial and conviction and asked him questions about whether he had a secret plan to expand video

38

lottery after the November 1992, election. (# 85, p. 428.)
Governor Caperton admitted that one person in his administration,
Mr. Bryan, has already been convicted on an allegation that the
Governor had a secret plan. (# 85, p. 433.) The Governor further
admitted that if he had one plan that he was telling his staff and
another he was telling the voters, that would make him look two-
faced. (# 85, pp. 434-35.) If such an allegation of a secret plan
were true, the Governor admitted this would be a threat to his
credibility. (# 85, p. 436.) Governor Caperton acknowledged a
poll from May/June of 1991. (# 85, p. 438.) The poll indicated
that 21 percent of those polled were mildly in favor of video
lottery, 16 percent were mildly opposed, 40 percent were strongly
opposed and 6 percent were not sure. (# 85, p. 440.)

Governor Caperton met with Larry Lippon on July 16, 1991, but
could not recall the substance of the meeting. (# 85, p. 442.)
Governor Caperton also met with Mr. Lippon on July 17, 1992, and
recalled talking about video lottery. (# 85, p. 444.) When asked
if after the meeting he told his chief of staff, Tom Heywood, that
he wanted to do the video lottery expansion after the election,
Governor Caperton responded in the negative. (# 85, pp. 444-45.)

e. Larry Beecher.

Petitioner represented Mr. Beecher in his divorce. Mr.
Beecher saw Petitioner on September 23, 1992, at Petitioner's
office for about an hour beginning at 11:00 a.m. (# 85, p. 451.)

39

f.   William Edward ReBrook.

Petitioner worked with Mr. Bryan at the Alcohol Beverage Control Commission until April 15, 1990, and then went with Mr. Bryan to the Lottery Commission.  Petitioner was legal counsel to the Lottery Commission.   He drafted and reviewed documents, negotiated contracts, wrote speeches and letters for Mr. Bryan and advised the commissioners.  (# 85, pp. 461-62.)  Petitioner had no set hours, and his salary ranged from $22,000 to $25,000. Petitioner gave no advice on policy matters.  (# 85, p. 461.)

When Petitioner arrived at the Lottery Commission, negotiations were ongoing with Mountaineer Park, who had approached the Lottery Commission in 1988 for permission to install video lottery terminals at their race track.  Legislation was passed in 1989, and when Petitioner arrived a contract was being negotiated and the Lottery Commission entered into a contract with Mountaineer Park to allow them to do video lottery at that race track. Originally, it was intended to be a four month experiment, but thereafter it continued to expand.  (# 85, p. 464.)

While Petitioner was employed by the Lottery Commission, there were continuous talks about expansion of video lottery.  (# 85, p. 465.)  In 1990, Petitioner attended a meeting with the Governor at Marshall University regarding expansion of video lottery.  (# 85, pp. 465-66.)

40

Petitioner negotiated the contract with G-Tech to become the sole source contractor to sell on-line tickets. (# 85, p. 467.) Scientific Games had the sole source contract for scratch-off tickets. (# 85, p. 468.)

Petitioner was familiar with VLC, but never met with anyone from that company and never attended any meeting regarding VLC's efforts to try to do business with the State of West Virginia. (# 85, pp. 471-72.) When the Lottery Commission issued an RFP in November or December of 1993, VLC was one of the companies that responded. (# 85, p. 472.)

Regarding his visit to Mr. Folio, Petitioner sought a campaign contribution and did not know Mr. Folio was recording the conversation. (# 85, p. 474.) Petitioner confirmed his conversation with Mr. Folio and stated that he presumed there was going to be video lottery after the election because of articles in the newspaper and because he had heard the commissioners and Mr. Bryan talk about it. (# 85, p. 477.) He knew "from reading the newspapers that video lottery was an extremely controversial issue and I knew that no politician in his right mind would do it before the election." (# 85, pp. 477-78.) Petitioner testified that no one at the Lottery Commission ever told him that the Lottery Commission was going to go into full speed after the election. (# 85, p. 478.) Petitioner stated that the information he provided to Mr. Folio was not a secret. (# 85, p. 481.)

41

On September 23, 1992, Petitioner was not present at the Lottery Commission offices.  On September 24, 1992, Petitioner was at the Lottery Commission and had a conversation with Mr. Moran about VLT stock.   Petitioner did not learn anything about a telephone call that occurred on September 23, 1992, between Mr. Lippon and Mr. Bryan, but in response to his conversation with Mr. Moran, he called a stockbroker he knew and placed an order for 100 shares of VLC stock.  At the time, Petitioner knew of no dealings between the Lottery Commission and VLC and did not believe he was in violation of two relevant statutes which he had read, the State Lottery Act and the State Ethics Act.  (# 85, pp. 484-85, 487-89, 493.)   The State Lottery Act prohibited lottery employees from purchasing stock in companies doing business with the lottery, but Petitioner testified that he believed he was not an employee for purposes of that statute and the Ethics Act as well. (# 85, pp. 488-89.)

Petitioner testified that while he received information from Mr. Moran about VLC stock, he never received information from Mr. Bryan about VLC stock.  (# 85, p. 493.)  Petitioner testified that when he told Mr. Robertson and Mr. Thomas about the stock, it was not his intent to violate the two statutes cited above.  (# 85, p. 494.)

Regarding the report about which Mr. Giambrone testified, Petitioner testified that he had never seen the report before trial

and did not prepare it.  (# 85, p. 496.)

Regarding the questions and answers prepared for the lottery meeting in late 1992 that Mr. Giambrone presented, Petitioner testified that he helped prepare some of the questions, along with Mr. Bryan and some of the commissioners.  (# 85, pp. 496-97.) Petitioner gave the questions to Mr. Giambrone and attended the Lottery Commission meeting where they were presented.  (# 85, p. 497.)

When asked whether Governor Caperton ever told him that video lottery expansion would not occur statewide until after the election in 1992, Petitioner testified that he did not, nor did anyone at the Lottery Commission.  (# 85, p. 498.)

On cross examination, Petitioner admitted that he had signed documents over the years describing himself as an employee of the Lottery Commission.  (# 85, p. 500.)  Petitioner admitted that documents such as a drug awareness certification form and a conflict of interest statement describe Petitioner as an employee. (# 83, pp. 502-03.)  Petitioner admitted on cross examination that he drafted a letter to the attorney general for Mr. Bryan's signature in August of 1990, which sought the appointment of Petitioner as a special assistant attorney general and stated that one of the big projects of the Lottery Commission was video lottery, and Petitioner would be of great benefit to the Lottery Commission in "planning strategies."  (# 85, pp. 505-06.)

Petitioner conceded that when he was interviewed by agents he told them that at some point, the sole source idea leaked out. (# 85, p. 509.)  Petitioner told the agents that the Governor was directly involved in the decision made on video lottery. (# 85, p. 512.)  Petitioner conceded that he knew the Governor was directly involved in video lottery because of the political and social relationship that Steve Haid, a lobbyist for VLC, and VLC's other lobbyists had with the Governor. (# 85, p. 513.)  Because of these relationships, Petitioner thought the Governor would speak to the other Lottery Commissioners about VLC. (# 85, p. 513.)

Petitioner may have told the agents of a meeting among Mr. Haid, Mr. Bryan and the Governor about video lottery and that Mr. Haid helped write a memo which set forth that VLC intended to build a factory in West Virginia if they could get a sole source contract. (# 85, p. 515.)  Petitioner also told the agents that Bill Woodford said that "he liked the machinery that VLC made better." (# 85, pp. 516-17.)  Petitioner told the agents that if VLC had gotten the contract, he would have immediately sold his stock. (# 85, p. 517.)

g.  Thomas Heywood.

Mr. Heywood worked for Governor Caperton as his legal counsel and later, as his chief of staff.  At the time of trial, Mr. Heywood was in private practice. (# 85, p. 530.)  Mr. Heywood testified that as of approximately July of 1992, he learned that

44

the Governor's nonpublic intentions were to proceed with an expansion of video lottery after the election of 1992.  (# 85, pp. 531-32.)

On cross examination, Mr. Heywood testified that he did not know if Petitioner ever met with the Governor (other than a meeting in 1990) or whether the Governor ever told Petitioner of his intentions.  (# 85, pp. 532-33.)

4. Trial Motions.

At trial, the Petitioner moved for a judgment of acquittal. In response, the government stated that

> viewing the evidence in the light most favorable to the
> government, which is the appropriate thing to do at this
> time, we have made a prima facie showing.  We have shown
> confidential information was used by Mr. ReBrook in
> purchasing stock and in tipping others to buy the stock.
> We have shown that he acted as lottery attorney while he
> had existing conflicts of interest.  We have shown that
> he thereby defrauded the State of West Virginia Lottery
> Commission out of its rights and his honest services
> viewing the evidence in the light most favorable.

(# 84, pp. 357-58.)

5.  Closing Argument.

In its closing argument, the United States argued that Petitioner owed the Lottery Commission and the State of West Virginia his honest services.  (# 86, p. 553.)

> Petitioner knew several important facts, in his capacity
> as lawyer for the Commission, that were not publicly
> known.  He knew the time table the Governor and the
> Director of the Lottery had for the expansion of video
> lottery, he knew that the contract was going to be given
> to VLT and that although the stock in that company had
> fallen, it was not going to go any lower.

(# 86, p. 554.)   This information was material; a person considering buying stock would want to know and would consider such information important.   (# 86, p. 558.)

Counsel for the United States continued:

Now, what did [Petitioner] do with this information he had.  He went out and bought stock.  He not only bought stock, he told his friends to go buy stock and they bought a lot of stock ....

Buying this stock was wrong.  And it was wrong because he was using information he had no right to use. He had no right to use that because the law is that a public servant can't use non-public information he gets in his job for his own benefit or for the benefit of his friends. *** And when he did use them, when he did use them, he stole them.  He misappropriated them.  And when he had that stolen information and he bought the stock, he committed the crime of insider trading.  And that is what is charged in count 2 of the indictment of this case.

But that isn't all he did wrong.  While [Petitioner] ow[n]ed the stock, all the stock he could afford to buy, he continued to represent the State of West Virginia in the Lottery Commission.  He continued giving legal advice while the commission ... [while concealing] from the commission, ... that he has a personal financial stake in the outcome of their decision.  He concealed from them his plan.

He had a plan.  His plan was to hold the stock until VLT got the contract for 25 million dollars. *** He was going to wait until they got the contract and then he was going to sell his stock and take his profit.  That's not honest.  That's not acting in good faith.  That is not an honest mistake.  That is a fraud.  It's a fraud on the Lottery Commission.  It's a fraud on the State of West Virginia.  By buying this stock and using this inside information, stolen information, by concealing his ownership of that stock and going ahead and advising the Lottery Commission, he defrauded the State of West Virginia out of its rights to his honest services. That's the charge in count 1.

The charge in count 1 is wire fraud. Count 1 charges the fraud scheme I have just described to you, buying the stock on insider information and defrauding the state by concealing his ownership of that stock. It's also charged in there that the execution of that fraud scheme he sent or caused to be sent certain signals, certain wire communications in interstate commerce.

(# 86, pp. 560-61.)

     6.  Jury Instructions.

The jury instructions on Count One, the wire fraud count, were

as follows:

The wire fraud. Count 1 of the indictment charges the defendant with wire fraud. That statute is found in the criminal code, 18 United States Code, Section 1343. It provides in part as follows: quote, "Whoever having devised or intending to devise any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, of a wire, radio or television communication in interstate or foreign commerce any writing, sign, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be guilty of an offense against the United States, end of quote.

Now, in order to prove the offense that is prohibited by this statute, the government would have to prove each of the following elements beyond a reasonable doubt: first, that this defendant knowingly devised a scheme or artifice to defraud as outlined in count one.

Second, that he did what he did with the intent to defraud.

And, third, that in advancing or furthering or carrying out this scheme to defraud, the defendant transmitted any writing, signal, or sound by means of a wire telephone communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire or telephone communication in interstate commerce.

             ***

47

The government must prove beyond a reasonable doubt, however, that the use of the wire or telephone communication further[ed] or advanced or carried out in some way the scheme or plan to defraud.

I've used the term "scheme and artifice." And as that is used in the wire fraud statute, that would include any plan or course of action intended to deceive others and to obtain by false or fraudulent pretenses money or property from the person or entity so deceived. For the purpose of the wire fraud statute, the term "scheme or artifice to defraud" includes also a scheme or artifice to deprive another of the intangible right of honest services.

\*\*\*

Fraud is a general term which embraces all efforts and means that individuals devise to obtain money and property of others or, as I've also described in these instructions, a plan to defraud someone or some entity of honest services due them or it.  A scheme to defraud is, therefore, any plan or design by which a person seeks to obtain money or property from another or defraud someone or some entity of honest services due them or it.

\*\*\*

Now, considering everything that I've told you and giving separate and independent consideration to each count of the indictment, if as to that particular count you find that the government has proven each and every element of that offense, as I've defined them to you beyond a reasonable doubt, then you may return a verdict of guilty on that particular count.  On the other hand, and giving again separate and independent consideration to the evidence on that particular count, if you find that the government has failed to prove any single one or more of those elements that I have described beyond a reasonable doubt against the accused, then you must return a verdict of not guilty on that particular count.

(# 86, pp. 586-90, 600.)

Regarding Count Two, the jury instructions stated, in pertinent part, as follows:

Count 2 of the indictment charges the defendant with a securities fraud ....

\*\*\*

Now, in order to sustain its burden of proof for the

48

crime of securities fraud, the government has to
establish the following elements beyond a reasonable
doubt: first, in connection with the purchase of the
securities described in the indictment, the defendant
knowingly used and employed manipulative and deceptive
devices, contrivances or schemes and artifices to defraud
or engaged in acts, practices, and courses of conduct
that operated as a fraud or ... deceit on any person
referred to in the indictment – any person or entity.
Secondly, that in connection with this purchase or sale,
the defendant made use of or caused the use of any means
or instrumentality of interstate commerce or of the mails
or of any facility of any National Securities Exchange.
And, third, that the defendant acted with the intent to
defraud.

(# 86, pp. 591-92.)

       7.   Post Trial Relief.

          a.   New Trial

Following his conviction, Petitioner moved for a new trial,
which was denied by Judge Haden.  Among other things, Petitioner
argued that the court erred by allowing the United States to
establish wire fraud by alleging Petitioner devised a scheme to
defraud West Virginians of their intangible right to honest
services pursuant to 18 U.S.C. § 1346 because the concept is
unconstitutionally vague.  The court found that its

instructions contained a specific and extensive
definition of the type of "scheme or artifice to defraud"
which violates the "intangible right of honest services"
under § 1346.
    The court concludes the concept of the duty of
honest services sufficiently conveys warning of the
proscribed conduct when measured in terms of common
understanding and practice.

United States v. ReBrook, 842 F. Supp. 891, 894 (S.D. W. Va. 1994).

Notably, in analyzing whether an instruction was warranted

about the specific duties the Rules of Professional Responsibility impose on lawyers regarding confidentiality of information, the court acknowledged in its decision that

> the evidence supported the government's charge [that Petitioner] used confidential information he gained by virtue of his position as Lottery counsel to garner profit for himself and his friends.

Id.

> b.  Appeal to Fourth Circuit.

Petitioner appealed his conviction to the United States Court of Appeals for the Fourth Circuit.  Among other things, Petitioner challenged his securities fraud conviction under Count Two, arguing that Judge Haden erred in allowing the United States to prosecute him under the "misappropriation theory" of securities fraud. Regarding Count One, Petitioner argued that "his conviction for wire fraud must also be reversed because the impermissible securities fraud allegation was the only ground upon which the jury could have based a guilty verdict on the wire fraud count."  United States v. ReBrook, 58 F.3d 961, 964 (4th Cir. 1995).  The Fourth Circuit concluded that Petitioner's conviction and sentence for securities fraud must be reversed because of their decision[8] not to adopt the misappropriation theory in the Fourth Circuit, but our Court of Appeals affirmed Judge Haden's decision to allow the wire

---

[8]   The Fourth Circuit had recently rejected the misappropriation theory in United States v. Bryan, 58 F.3d 933, 943-59 (4th Cir. 1995), abrogated by United States v. O'Hagan, 521 U.S. 642 (1997), the case in which Mr. Bryan was prosecuted for crimes arising from this same scheme.

fraud charge to be presented to the jury.

Regarding Petitioner's wire fraud conviction, our Court of Appeals framed the claim as follows:

> In order to convict ReBrook for wire fraud in violation of 18 U.S.C.A. § 1343 (West Supp.1995), the Government must prove: "1) a scheme to defraud and 2) the use of a wire communication in furtherance of that scheme." United States v. Brandon, 50 F.3d 464, 467 (7th Cir.1995). Additionally, under 18 U.S.C. § 1346 (1988), "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." In this case, the Government alleged that ReBrook schemed to defraud the citizens of the State of West Virginia of his honest and faithful services as the attorney for the Lottery Commission, and that he traded on confidential information.

Id. at 966 (footnote omitted).

The Fourth Circuit found Petitioner's argument challenging the validity of his wire fraud conviction under Count One to be puzzling "as to its exact meaning," but interpreted his argument to contend that because the court reversed the securities fraud conviction, the court must also reverse the wire fraud conviction on the ground that the two counts share the same underlying facts and form the basis for both crimes.  Id. at 966-67.  The Fourth Circuit disagreed, noting that while "a number of the underlying facts used to prove the securities fraud were also used to prove the wire fraud ... the two crimes are distinct and require the government to prove different elements in order to secure a conviction."  Id. at 967.

Importantly, the Fourth Circuit

> stress[ed] that, from our reading of his brief, ReBrook's appeal concerning the wire fraud count is narrow in scope. For example, ReBrook does not challenge 18 U.S.C. § 1346, which defines a "scheme or artifice to defraud" under the wire fraud statute as including the deprivation of "another of the intangible rights of government,"as being unconstitutionally vague. <u>ReBrook</u>, 837 F.Supp. at 171. Furthermore, ReBrook does not challenge the sufficiency of the evidence to support his conviction on the wire fraud charge.

<u>Id.</u> at 967 n.7.

  c. Appeal to Supreme Court of the United States.

  A petition for a writ of certiorari to the Fourth Circuit was denied.  <u>ReBrook v. United States</u>, 516 U.S. 970 (1995).

<u>The Writ of Error Coram Nobis and Standard of Review</u>

  The writ of error coram nobis derives from British common law. Judgments before the king's bench that were erroneous in matters of fact could be reversed through use of the writ, which, translated, means "before us."  3 William Blackstone, Commentaries, *406 n.5.  At common law, the writ was issued out of chancery; however, "the procedure by motion in the case is now the accepted American practice."  <u>United States v. Morgan</u>, 346 U.S. 502, 506 n.4 (1954).

  In American legal proceedings, the writ is not specifically authorized by statute, but instead derives from the all-writs provision of the Judicial Code.  <u>Id.</u> at 506.  That provision, 28 U.S.C. § 1651(a), provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  While its validity had at

one point become unclear, use of the writ in criminal cases was endorsed by the Supreme Court in Morgan; Justice Minton tartly noted in his dissent in that decision that the majority had "resurrecte[d]" the writ "from ... limbo." Morgan, 346 U.S. at 513 (Minton, J., dissenting).  However, in its rejuvenation of the writ, the majority cautioned that "[c]ontinuation of litigation after final judgment and exhaustion or waiver of any statutory right of review should be allowed through this extraordinary remedy only under circumstances compelling such action to achieve justice," id. at 511, and that "coram nobis [only] included errors 'of the most fundamental character'" id. at 512 (quoting United States v. Mayer, 235 U.S. 55, 69 (1914)).  More recently, it has been described as "an extraordinary tool to correct a legal or factual error." United States v. Denedo, 129 S. Ct. 2213, 2221 (2009).

"[T]he precise contours of coram nobis have not been 'well defined.'"  2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 41.2[b], at 2143 (6th ed. 2011) (quoting Denedo, 129 S. Ct. at 2220); see also Trenkler v. United States, 536 F.3d 85, 88 (1st Cir. 2008) (describing the writ as "poorly understood terrain").[9]  In the Fourth Circuit, four criteria

---

[9]  At the hearing on this matter, the United States asserted that Trenkler "seems to apply an actual innocence standard on coram nobis - period - that is, procedural default or no." (ECF No. 116, p. 23.)  The United States did not develop this argument in further briefing and, as a result, the court declines to address it here.

apparently must be met before relief under the writ is appropriate: "(1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character." United States v. Mandel, 862 F.2d 1067, 1077 (4th Cir 1988) (Hall, J., dissenting) (citing Hirabayashi v. United States, 828 F.2d 591, 604 (9th Cir. 1987)). However, other lower courts use varying standards for determining when a grant of the writ is appropriate. See, e.g., United States v. Kwan, 407 F.3d 1005, 1011 (9th Cir. 2005) (same); United States v. Novak, No. 98-1444, 1999 WL 357846, at *2 (2d Cir. May 26, 1999) ("To obtain coram nobis relief, [the petitioner] must show (1) that he is suffering continuing legal consequences from his conviction, (2) that cause exists for his failure to seek appropriate earlier relief, and (3) that he will be prejudiced by a denial of the relief sought because his convictions were unjust."); United States v. Bruno, 903 F.2d 393, 396 (5th Cir. 1990) (grant of coram nobis relief conditioned upon petitioner's "establish[ing] both that he is suffering civil disabilities as a consequence of the criminal conviction and that the error involved in his conviction is 'of the most fundamental character'--that is, error that has resulted in a complete miscarriage of justice"); United States v. Barber, 881 F.2d 345, 348 (7th Cir. 1989) (petitioner seeking writ of error

54

coram nobis must establish that "(1) the claim could not have been raised on direct appeal; (2) the claimed error is a defect of a type that sap[s] the proceeding of any validity; (3) the conviction produced lingering and still extant collateral civil disabilities; and (4) the error is of a type that would have justified relief during the term of imprisonment") (internal quotation omitted).

Before Petitioner's conviction can be attacked collaterally in this coram nobis proceeding, he must overcome the significant procedural hurdle of showing that he raised the issue he now wishes to challenge on direct appeal.  The Third Circuit noted in United States v. Osser, 864 F.2d 1056, 1059 (3d Cir. 1988) that

> [t]he interest in finality of judgments is a weighty one
> that may not be casually disregarded.  Where sentences
> have been served, the finality concept is of an
> overriding nature, more so than in other forms of
> collateral review such as habeas corpus, where a
> continuance of confinement could be manifestly unjust
> .... In a coram nobis case, [in contrast to habeas corpus
> under 28 U.S.C. § 2255], where sentence has been served
> and nothing remains but some financial detriment,
> judicial incentive to excuse compliance with procedural
> prerequisites is of a lower order.

The court concluded that the "issue that Osser brings at this late date should have been included in his direct appeal; to now excuse his failure to exhaust direct appellate procedures would disproportionately harm the prosecution."  Id. at 1062; see also Mandel, 862 F.2d at 1077 (Hall, J., dissenting) ("Thus, while it is clear that coram nobis and habeas corpus are roughly 'similar' proceedings, it is even more clear that the burden on a coram nobis

petitioner is, and properly should be, greater than that placed on a habeas petitioner.") (citations omitted).

Where procedural default has occurred, the "cause and actual prejudice" standard may be applied to overcome the default. United States v. Frady, 456 U.S. 152, 167 (1982) (citing Davis v. United States, 411 U.S. 233 (1973); Francis v. Henderson, 425 U.S. 536 (1976); Wainwright v. Sykes, 433 U.S. 72 (1977)). "Under this standard, to obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." Frady, 456 U.S. at 168. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). A showing that the factual or legal basis for a claim was not reasonably available to counsel can constitute cause. Id. (citing Reed v. Ross, 468 U.S. 1, 16 (1984)).

In the alternative, a petitioner who has procedurally defaulted can show that he is actually innocent. Murray, 477 U.S. at 496. Actual innocence "means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998). To prevail under an actual innocence theory, a petitioner

must show in light of "all the evidence," that "it is more likely than not that no reasonable juror would have convicted him ...." Schlup v. Delo, 513 U.S. 298, 327, 329 (1995). An actual innocence examination encompasses both charged counts, as well as counts that the government may have forgone. Bousley, 523 U.S. at 624.

As discussed further below, in this case involving alternative theories of guilt, whether or not this extraordinary remedy should be granted in light of the holding in Skilling is subject to a harmless error analysis:

> In Hedgpeth v. Pulido, 555 U.S. 57 [61], 129 S. Ct. 530[, 532], 172 L.Ed.2d 388 (2008) (per curiam), the Supreme Court recently confirmed that an alternative-theory error—i.e., where a jury rendering a general verdict was instructed on alternative theories of guilt and may have relied on an invalid theory—is subject to harmless-error analysis "so long as the error at issue does not categorically 'vitiat[e] all the jury's findings.'"

United States v. Skilling, 638 F.3d 480, 481 (5th Cir. 2011). Therefore, in instances where there has not been procedural default or the procedural default has been excused, the court must determine whether the error cited by the petitioner "had a substantial and injurious effect" or influence on the jury's verdict. Hedgpeth, 555 U.S. at 58 (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).

<u>The Impact of Skilling on 18 U.S.C. § 1346</u>

Petitioner filed his petition for a writ of error coram nobis because of the recent decision of the Supreme Court in Skilling v. United States, 130 S. Ct. 2896, 2904 (2010), wherein the Court

found § 1346, which proscribes fraudulent deprivations of "the intangible right of honest services" as "properly confined to cover only bribery and kickback schemes."  Because the alleged misconduct of the defendant, the former chief executive officer of Enron Corporation, involved no bribe or kickback, the Court found that it did not fall within the Court's confinement of § 1346's proscription.  Id.

In Skilling, the Court considered at length the historical development of the modern day mail and wire fraud provisions that proscribe deprivation, not only of money or property but of intangible rights.  Id. at 2926.  "In 1987, this Court, in McNally v. United States, [483 U.S. 350, 356 (1987)], stopped the development of the intangible-rights doctrine in its tracks."  Id. at 2927.  In McNally, the Court limited the statute "in scope to the protection of property rights," and stated that "[i]f Congress desires to go further ... it must speak more clearly than it has."  McNally, 483 U.S. at 360.  The following year, Congress enacted a new statute that included honest services. § 1346.  Skilling, 130 S. Ct. at 2927.  Skilling asserted that § 1346 was unconstitutionally vague, but the Court rejected this argument and instead, determined that

> § 1346 should be construed rather than invalidated. First, we look to the doctrine developed in pre- McNally cases in an endeavor to ascertain the meaning of the phrase "the intangible right of honest services." Second, to preserve what Congress certainly intended the statute to cover, we pare that body of precedent down to its core: In the main, the pre-McNally cases involved

58

> fraudulent schemes to deprive another of honest services
> through bribes or kickbacks supplied by a third party who
> had not been deceived.  Confined to these paramount
> applications, § 1346 presents no vagueness problem.

Id. at 2928.  Thus, the Court concluded that "[i]nterpreted to
encompass only bribery and kickback schemes, § 1346 is not
unconstitutionally vague." Id. at 2933.

In Skilling, the Court found that

> [b]ecause the indictment alleged three objects of the
> conspiracy - honest-services wire fraud, money-or-
> property wire fraud, and securities fraud - Skilling's
> conviction is flawed.  See Yates v. United States, 354
> U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957)
> (constitutional error occurs when a jury is instructed on
> alternative theories of guilt and returns a general
> verdict that may rest on a legally invalid theory).  This
> determination however, does not necessarily require
> reversal of the conspiracy conviction; we recently
> confirmed in Hedgpeth v. Pulido, 555 U.S. ____, 129 S.Ct.
> 530, 172 L.Ed.2d 388 (2008) (per curium), that errors of
> the Yates variety are subject to harmless-error analysis.
> *** We leave this dispute for resolution on remand.

Id. at 2394.

In Hedgpeth, the jury was instructed on two alternative
theories of guilt, one of which was invalid under California law.
The Court found that such error was not a structural error
requiring that a conviction based on a general verdict be set aside
on collateral review without regard to whether the flaw in the jury
instructions prejudiced the defendants; rather, it was subject to
the harmless error standard of review.  Hedgpeth, 555 U.S. at 61-
62.  Harmless error review means that "[a]ny error, defect,
irregularity, or variance that does not affect substantial rights

must be disregarded." Fed. R. Crim. P. 52(a). A reviewing court should ask whether the jury instructions "'had substantial and injurious effect or influence in determining the jury's verdict.'" Hedgpeth, 555 U.S. at 58 (quoting Brecht, 507 U.S. at 623).

Issues Presented

1. Procedure Default: Was the "honest services" jury instruction issue preserved at trial or on direct appeal?

2.a. Cause and Actual Prejudice: If not, has Petitioner shown "cause and actual prejudice" as set forth in United States v. Frady, 456 U.S. 152, 167 (1982), sufficient to excuse the default?

2.b. Actual Innocence: If Petitioner cannot show cause and actual prejudice, may his claim still be reviewed because the alleged error "probably resulted in the conviction of one who is actually innocent"? Bousley v. United States, 523 U.S. 614, 623 (1998) (In light of all the evidence, it is more likely than not that no reasonable juror would have convicted him?).

2.b.1. Was Petitioner convicted of offenses as to which the evidence and the jury instructions presented alternative theories, i.e., property loss and deprivation of the intangible right of honest services?

2.b.2. If so, and assuming the deprivation of honest services theory was invalid and constituted error, did the error have a "'substantial and injurious effect or influence in determining the verdict?'" Hedgpeth v. Pulido, 555 U.S. 57, 61 (2008) (quoting

60

Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)); Skilling v. United States, 130 S. Ct. 2896, 2934 (2010) (where alternative theories are alleged and the jury returns a general verdict that may rest on a legally invalid theory, such error is subject to a harmless error analysis).

<u>Analysis</u>

**1.   Petitioner did not challenge the honest services jury instruction as being unconstitutionally vague either at trial or on direct appeal and, as a result, is in procedural default.**

The court has carefully reviewed the transcript of the charge conference as well as the jury instructions, and found no objection from Petitioner related to the constitutionality of § 1346. (# 86, pp. 541-552, 583-608.)

As Petitioner points out in his reply, he moved prior to trial to dismiss the honest services wire fraud count because it was unconstitutionally vague, ReBrook, 837 F. Supp. at 169, and again, after trial, ReBrook, 842 F. Supp. at 894. Both times, Petitioner was unsuccessful.

However, as explicitly stated by the Fourth Circuit, Petitioner failed to raise the issue on appeal. Importantly, the Fourth Circuit noted that

> [w]e stress that, from our reading of his brief, ReBrook's appeal concerning the wire fraud count is narrow in scope. **For example, ReBrook does not challenge 18 U.S.C. § 1346, which defines a "scheme or artifice to defraud" under the wire fraud statute as including the deprivation of "another of the intangible rights of government,"as being unconstitutionally vague.**

61

ReBrook, 58 F.3d at 967 n.7 (emphasis added).

Petitioner argues that he filed a petition for rehearing with a suggestion for rehearing en banc with the Fourth Circuit, and that an electronic version (he has not seen the final version), includes a detailed argument challenging the validity of his honest services wire fraud conviction.  (ECF No. 117, pp. 2-3.)  The version to which Petitioner refers does not challenge § 1346 as being unconstitutionally vague.  (ECF No. 120-1, pp. 1-19.)  Furthermore, even if this version had actually been filed, "a party does not preserve an argument by raising it for the first time in a motion for reconsideration or rehearing ...."  United States v. Huntington Nat'l Bank, 574 F.3d 329, 331 (6th Cir. 2009).

While Petitioner asserts that an electronic version of his petition for a writ of certiorari filed with the Supreme Court challenged the unconstitutional vagueness of honest services wire fraud, Petitioner has not produced this document and concedes that he does not know whether this version was final or whether it was actually filed.  (ECF No. 117, p. 3.)

Petitioner's arguments that he preserved the issue are a stretch at best.  There is no evidence that the briefs were actually filed, and in the case of the electronic version of the Fourth Circuit brief, the constitutionality of § 1346 is not challenged.  What is definitive, is the statement by the Fourth Circuit that Petitioner did not challenge § 1346 as being

unconstitutionally vague.  This answers the question as to whether Petitioner raised the issue on appeal.  Clearly, he did not.

Equally unconvincing is Petitioner's argument that because Skilling merely construed § 1346, Petitioner was not required on appeal to challenge the statute as unconstitutionally vague. Rather, any appeal where Petitioner challenged the construction of the statute should be sufficient to overcome procedural default. (ECF No. 117, p. 5.)  "Petitioner respectfully submits that since he challenged the validity of his honest services wire fraud conviction in his appeal to the Fourth Circuit, [albeit on grounds other than unconstitutional vagueness,] he clearly is entitled to raise this Skilling issue in this coram nobis proceeding."  (ECF No. 117, p. 6.)

While the Court in Skilling stated that § 1346 "should be construed rather than invalidated," Skilling, 130 S. Ct. at 2928, the Court determined that § 1346 presented no vagueness problem when "[i]nterpreted to encompass only bribery and kickback schemes," id. at 2933.  Indeed, the Court stated that "[r]eading the statute to proscribe a wider range of offensive conduct, we acknowledge, would raise the due process concerns underlying the vagueness doctrine."  Id. at 2931.  In other words, the Court construed § 1346 in such a way, i.e., to encompass only bribery and kickback schemes, to avoid a finding that the statute was unconstitutionally vague.  Petitioner's reliance on the fact that

63

Skilling ultimately construed § 1346 rather than find it outright unconstitutional for vagueness ignores the fact that without the limitation imposed by the Court in Skilling, the statute would have been unconstitutionally vague.  Moreover, Petitioner cites no support in the case law for his assertion that a general challenge to his honest services wire fraud conviction is sufficient to adequately preserve the issue on direct appeal.

In fact, Petitioner did not even challenge the construction of the statute in his appeal to the Fourth Circuit.  Instead, the Fourth Circuit was puzzled by Petitioner's argument, but interpreted it to mean that because the court "reverse[d] his securities fraud conviction, we must also reverse the wire fraud conviction on the ground that the two counts share the same underlying facts and form the basis for both crimes." ReBrook, 58 F.3d at 966-67.

In making the argument that a general challenge to the statute is sufficient, ReBrook relies on the following language contained in a footnote in the Fourth Circuit's decision:

> We do not understand ReBrook to be making the same argument concerning his wire fraud conviction that Bryan makes concerning his mail fraud conviction in Bryan.  In that case, Bryan argued that "the evidence was insufficient to support [Bryan's] convictions under these [mail fraud] provisions [18 U.S.C. §§ 1341, 1346] because 'there was no evidence that [he] violated any law, statute or binding regulation in his conduct with respect to the ... video lottery contract.'" Bryan, 58 F.3d at 940 (quoting Appellant Bryan's Brief at 11-12). After an extended discussion, we rejected this argument on the ground that "[w]e see no reason [ ] to read into the mail

> fraud statute an independent criminal violation
> requirement when the fraud conviction is based on the
> deprivation of the right to intangible services as
> opposed to the deprivation of property or money, as in
> <u>Carpenter</u>." <u>Id.</u> at 941.
>
> ReBrook's argument appears to be more narrow than that of
> Bryan, focusing on the interrelated nature of the
> securities fraud and wire fraud prosecutions rather than
> on whether a violation of the wire fraud statute requires
> the violation of some law or regulation other than the
> wire fraud statute itself. We note, however, that to the
> extent ReBrook puts forward the same argument as Bryan,
> our reasoning concerning the mail fraud statute in <u>Bryan</u>
> is equally applicable in this case for the wire fraud
> statute. <u>Carpenter</u>, 484 U.S. at 25 n. 6, 108 S.Ct. at 320
> n. 6; <u>see also Belt v. United States</u>, 868 F.2d 1208, 1211
> (11th Cir.1989) ("The wire fraud statute tracks the
> language of the mail fraud statute, 18 U.S.C. § 1341
> [counterfeiting]. The statutes are given a similar
> construction and are subject to the same substantive
> analysis.").

<u>Id.</u> at 967 n.6.

Even though the court stated that to the extent Petitioner puts forth the same argument as in <u>Bryan</u> its reasoning was equally applicable, the Fourth Circuit's footnote makes clear that it *did not* read Petitioner's argument to challenge the construction of the wire fraud statute in the same way that the defendant in <u>Bryan</u> challenged the mail fraud statute.

Thus, the court proposes that the presiding District Judge find that Petitioner has procedurally defaulted his claim that § 1346 is unconstitutionally vague as applied in his case.

### 2. Petitioner has shown cause but not actual prejudice sufficient to excuse the procedural default.

#### a. Petitioner has shown cause to excuse his procedural default.

Petitioner states in his reply that he did not raise the constitutional challenge on appeal because, based on existing law, "Petitioner's counsel was convinced the securities fraud conviction could not be separated from the wire fraud conviction, and he was convinced the securities fraud conviction would be set aside, which it was." (ECF No. 110, p. 10.)

Petitioner further asserts that his challenge on constitutional grounds would have been unsuccessful based on the statement of Judge Haden in his pretrial decision that "Courts have convicted defendants for depriving government of honest services for hundreds of years." (ECF No. 110, p. 10 (quoting ReBrook, 837 F. Supp. at 171)). Petitioner cites similar language from the Fourth Circuit's decision in United States v. Bryan, 58 F.3d 933 (4th Cir. 1995) in his attempt to argue that any appeal on constitutionality grounds would have been fruitless. (ECF No. 110, p. 10.)

The United States argues that while cause may be shown where a question is "'so novel'" that its legal basis is not "'reasonably available'", Petitioner cannot show cause for his failure to raise it on direct appeal since he raised the vagueness challenge to § 1346 before the trial court. (ECF No. 109, p. 12) (quoting Reed v. Ross, 468 U.S. 1, 16 (1984)).

The court proposes that the presiding District Judge find that Petitioner has shown cause for his default. Recently, in Stayton

66

v. United States, 766 F. Supp.2d 1260, 1266 (M.D. Ala. 2011), the

United States District Court for the Middle District of Alabama

recognized that

> Skilling represents just the sort of "clear break with
> the past" that the United States Supreme Court
> contemplated as giving rise to "cause." [Reed v. Ross,
> 468 U.S. 1, 17 (1984)] (quoting [United States v.
> Johnson, 457 U.S. 537, 549 (1982)]. Although this Court
> has not undertaken an independent review of every honest-
> services fraud decision since the enactment of § 1346 in
> 1988, it notes that in 2009 the Solicitor General
> represented to the Supreme Court that "courts have
> defined the two major categories (bribes/kickbacks and
> undisclosed self-dealing/conflicts-of-interest) that fall
> within the [honest-services fraud] paradigm" and that
> "courts have universally characterized as 'core
> misconduct' covered by the statute cases ... based on a
> public official's undisclosed conflict of interest."
> Brief for United States at 24 & 35 Black v. United
> States, 130 S.Ct. 2963 (2010) (No. 08-876), 2009 WL
> 3155001, at * 24, 2009 U.S. S.Ct. Briefs LEXIS 1009 at
> *26-27 & *43-44; see also Brief for United States at 55
> Skilling v. United States, 130 S.Ct. 2896 (2010) (No. 08-
> 1394), 2010 WL 302206 at *45, 2010 U.S. S.Ct. Briefs
> LEXIS 33 at *76 ("both forms of undisclosed self-dealing
> are core honest services frauds"). Neither Skilling's
> lawyers nor the Skilling Court identified any court of
> appeals case decided in the twenty-plus years after §
> 1346 was enacted in which conflicts of interest were
> found to be outside the scope of the honest-services
> fraud statute. The Skilling Court acknowledged that
> "[u]niformly, [the courts of appeal] ... have declined
> to throw out the statute as irremediably vague."
> Skilling, 130 S.Ct. at 2928.

Based on this reasoning, the court in Stayton found that the

petitioner in that case brought pursuant to 28 U.S.C. § 2255 had

shown cause. Even within the Fourth Circuit, Bryan rejected the

vagueness challenge to § 1346 and acknowledged the longstanding

precedent prior to McNally of doing so. Bryan, 58 F.3d at 941 n.3

(4th Cir. 2004) (rejecting Bryan's argument that § 1346 should be declared void for vagueness and acknowledging consistency with pre-McNally practice in which vagueness challenges to prosecutions under the mail fraud statute were generally rejected); see also ReBrook, 837 F. Supp. at 171 (The District Court rejected Petitioner's challenge to § 1346 on vagueness grounds, noting that "[c]ourts have convicted defendants for depriving government of honest services for hundreds of years.").

Notably, the court in Stayton acknowledged the Supreme Court's statement in Engle v. Isaac, 456 U.S. 107, 130 n.35 (1982) that "futility cannot constitute cause if it means simply that a claim was unacceptable to [a] particular court at [a] particular time ...." Stayton, 766 F. Supp. 2d at 1267 n.7; see also Bousley, 523 U.S. at 623 (same).[10]  The court found no inconsistency among the Court's statements in Engle and Bousley and Reed:

> had the Bousley Court intended to overrule Reed v. Ross, it would have said so. The Bousley -standard - requiring a defendant to raise a constitutional claim if that claim is finding traction in other courts even if not the "particular court" in which the defendant is being tried - can be reconciled with the Reed v. Ross - standard - acknowledging that where "longstanding and widespread practice" in a "near-unanimous body of lower court authority" has indicated that a constitutional claim is

---

[10]   In Walker v. Rivera, C/A No. 3:10-2464-RMG, 2011 WL 4480170, at *3 (D. S.C. Sept. 26, 2011), the United States District Court for the District of South Carolina rejected Stayton as contrary to Bousley and the "greater weight" of post-Skilling case law that has followed Bousley.  The court finds Walker unconvincing in light of the more complete analysis conducted by the court in Stayton, statements by the Fourth Circuit in Bryan, by Judge Haden in ReBrook and the Court's statement in Skilling that "[u]niformly, [the courts of appeal] ... have declined to throw out the statute as irremediably vague." Skilling, 130 S. Ct. at 2928.

> meritless, a defendant need not continue to make it.
> What matters is whether rejection of a constitutional
> claim has been nearly universal.  As the Supreme Court
> itself suggested, once it is plain that a "near-unanimous
> body of lower court authority" has rejected a
> constitutional claim, "we might actually disrupt ...
> proceedings by encouraging defense counsel to include any
> and all remotely plausible constitutional claims that
> could, some day, gain recognition." <u>Reed v. Ross</u>, 468
> U.S. 1 at 16, 104 S.Ct. 2901.  After a certain point, it
> is not merely futile to raise an issue that a near-
> unanimous body of lower court authority treats as
> meritless, it is detrimental.  The defendant, defense
> counsel, and courts are all better served by focusing
> their limited resources and time on issues to which
> courts remain open and receptive.

<u>Stayton</u>, 766 F. Supp.2d at 1267 n.7.

The reasoning and thorough analysis contained in <u>Stayton</u> are the bases for this court's recommendation that the presiding District Judge find that Petitioner has met the cause element of "cause and prejudice."  Certainly, there may be cases where the argument that futility should excuse the default will be made and rejected on the basis of <u>Engle</u> and <u>Bousley</u>.  In light of the prior precedent related to § 1346 and the uniformity throughout the country pre-<u>Skilling</u> that § 1346 was not void for vagueness, Petitioner's case is not one of them.

Finally, Petitioner, for good reason, did not raise the novelty argument that the United States suggests this court should reject as a basis for cause.  As discussed above, the court's analysis in <u>Stayton</u> provides a basis for finding cause for Petitioner's failure to fully raise the issue below, and the court proposes the presiding District Judge so find.

69

      **b.  Petitioner has not shown prejudice.**

        **i.  The standard for prejudice is harmless error as defined in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993).**

As to prejudice, the court in <u>Tyler v. McCaughtry</u>, 293 F.Supp.2d 920, 925 (E.D. Wis. 2003), observed that "[t]he concept of prejudice in the cause and prejudice context is surrounded by uncertainties." (citing 2 Randy Hertz & James S. Liebman, <u>Federal Habeas Corpus Practice and Procedure</u> § 26.3c, at 1220-21 (4th ed. 2001)).

In <u>United States v. Frady</u>, 456 U.S. 152, 168 (1982), the Supreme Court acknowledged that it refrained in <u>Wainwright v. Sykes</u>, 433 U.S. 72, 91 (1977), from giving "precise content" to the term "prejudice," expressly leaving to future cases further elaboration of the significance of that term. In <u>Frady</u>, the Court reaffirmed an earlier formulation of prejudice, which stated that the instruction cannot be merely undesirable, erroneous or even universally condemned, but rather, the ailing instruction by itself must have so infected the entire trial that the resulting conviction violated due process. <u>Frady</u>, 456 U.S. at 169; <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977); <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973). In <u>Frady</u>, the Court wrote, "[c]ontrary to Frady's suggestion, he must shoulder the burden of showing, not merely that the errors at his trial created a <u>possibility</u> of prejudice, but that they worked to his <u>actual</u> and substantial disadvantage,

infecting his entire trial with error of constitutional dimensions." Frady, 456 U.S. at 170.

The court in Tyler observed that this formulation "offers little guidance" and that additionally, "the Court's decisions do not identify the standard by which the courts should determine whether the alleged error caused *enough* or the *right kind* of prejudice[.]" Tyler, 293 F. Supp.2d at 925 (quoting Hertz & Liebman, § 26.3c, at 1221).

In Tyler, the court noted that several possible standards have been suggested, including the harmless error standard from Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), whether the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht, 507 U.S. at 637. Two years later, in O'Neal v. McAninch, 513 U.S. 432 (1995), the Court clarified its approach to the harmless error analysis after the Sixth Circuit in O'Neal placed the burden of establishing error on the petitioner. In vacating and remanding the decision of the Sixth Circuit, the Court in O'Neal stated that while the Sixth Circuit set forth the proper standard from Brecht, "rather than ask whether the record's facts satisfied this

71

standard, the court seemed to refer to a burden of proof." <u>O'Neal</u>, 513 U.S. at 436.  The Court in <u>O'Neal</u> explained that the judge should not shift the burden to help control the presentation of evidence at trial, but rather, the judge should apply a

> legal standard (harmlessness) to a record that the presentation of evidence is no longer likely to affect. In such a case, we think it conceptually clearer for the judge to ask directly, "Do I, the judge, think that the error substantially influenced the jury's decision?" than for the judge to try to put the same question in terms of proof burdens (<u>e.g.</u>, "Do I believe the party has borne its burden of showing ...?").

<u>Id.</u> at 436-37.  In short, "[w]hen a federal judge in a habeas proceeding is in grave doubt[11] about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless.  And the petitioner must win."  <u>Id.</u> at 436.  The Court in <u>O'Neal</u> acknowledged its own language from <u>Brecht</u> that suggests habeas petitioners must establish actual prejudice, 507 U.S. at 637, but stated that "[t]his language, however, is not determinative.  The issue in <u>Brecht</u> involved a choice of substantive harmless-error standards:  the stricter [<u>Chapman v. California</u>, 386 U.S. 18, 24 (1967)], or the less strict <u>Kotteakos</u>, measure of harmlessness. <u>Both</u> of those cases had resolved the issue now before us the same way, placing the risk of doubt on the State."  <u>O'Neal</u>, 513 U.S. at 438-39; <u>contra</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 795 (2001) (stating

---

[11] "Grave doubt" was defined by the Court as "in the judge's mind, the matter is so evenly balanced that he [or she] feels ... in virtual equipoise as to the harmlessness of the error."  <u>O'Neal</u>, 513 U.S. at 435.

that the petitioner must establish that the error had a substantial and injurious effect or influence in determining the jury's verdict pursuant to Brecht); but see Gray v. Moore, 520 F.3d 616, 625-26 (6th Cir. 2008), cert. denied, 555 U.S. 894 (2008) (acknowledging that under O'Neal, the harmless error inquiry "does not assign an affirmative burden of proof on Gray ... nor does it require Gray to show that the error was outcome-determinative, but instead 'plac[es] the risk of doubt on the State.'" (quoting O'Neal, 513 U.S. at 439)).

More recently, in Fry v. Pliler, 551 U.S. 112, 121 n.3 (2007), the Court held that on collateral review by a federal habeas court of a criminal judgment by a state court, the federal court assesses prejudicial impact of the state court's constitutional error under Brecht instead of Chapman.  The Court stated in a footnote that it was presented with the question of whether under Brecht, the petitioner or the State bears the burden of persuasion on the question of prejudice.  The Court stated in Fry:

> We have previously held that, when a court is "in virtual equipoise as to the harmlessness of the error" under the Brecht standard, the court should "treat the error ... as if it affected the verdict ...."  O'Neal v. McAninich, 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). The majority opinion below did not refer to O'Neal, presumably because the majority harbored no grave doubt as to the harmlessness of the error.  Neither did the dissenting judge refer to O'Neal, presumably because she did not think the majority harbored grave doubt as to the harmlessness of the error.  Moreover, the State has conceded throughout this § 2254 proceeding that it bears the burden of persuasion.  Thus, there is no basis on which to conclude that the court below ignored O'Neal.

73

Id.  While the Court does not answer the question presented directly, it does acknowledge the State's concession that it bears the burden of persuasion. Fry, 551 U.S. at 122 (Stevens, J. concurring in part and dissenting in part) ("[T]he Brecht standard ... imposes a significant burden of persuasion on the State.")

In Smith v. Dixon, 14 F.3d 956, 976 (4th Cir. 1994), our Court of Appeals acknowledged that the "harmless error analysis [from Brecht] is essentially the same analysis we are required to perform in order to decide whether [the petitioner] has shown actual prejudice to excuse his procedural default ...." Smith was decided before O'Neal's statements regarding the "burden of proof" and its place in the harmless error analysis and Fry. Notably, Smith further states that the "[h]armless error analysis ... requires a federal habeas court to review the cold record and draw a legal conclusion concerning the probable impact the error had in the context of the proceedings as a whole." Smith, 14 F.3d at 976.

Thus, the one potential inconsistency in utilizing a harmless error analysis to determine prejudice at the procedural default stage was aptly noted by the court in Tyler.  In Tyler, the court acknowledged that the prejudice requirement of "cause and prejudice" for procedural default and the harmless error standard could differ in that, depending upon how the prejudice requirement is defined, "it could operate to shift the burden from the state, which appears to have the burden of showing that an error was

74

harmless, ... to the petitioner, who must demonstrate prejudice [for purposes of excusing procedural default]...." Tyler, 293 F. Supp.2d at 928 n.9 (citing Brecht, 507 U.S. at 637; O'Neal, 513 U.S. at 438-39; Penry, 532 U.S. at 795).

The court in Tyler concluded that

> [t]o the extent there are differences between the two
> standards, application of a stricter standard to a
> petitioner who has shown cause would be fundamentally
> unfair.  If a petitioner has shown cause, his default
> was, by definition, the result of factors beyond his
> control.  See Murray, 477 U.S. at 488, 106 S.Ct. 2639
> (holding the petitioner must show that some objective
> factor external to the defense caused default)....
>        Further, the prejudice standard would be useless if
> it were less stringent than the Brecht harmless error
> standard.  If a court determined that a petitioner had
> shown prejudice under the less-stringent standard, it
> would still have to consider the merits of his claims
> and, unless the state waived the harmless error defense,
> determine whether any constitutional error was harmless.
> It is hard to see any point in requiring courts to
> consider a petitioner's claims twice under these two,
> nearly identical standards.

Tyler, 293 F. Supp.2d at 928-29 (footnotes omitted).

There is an additional issue the court must address related to the harmless error analysis.  There is a different standard of review for harmless error which is applied on direct review.  On remand in Skilling, the Fifth Circuit applied the standard set forth in Neder v. United States, 527 U.S. 1, 19 (1999),[12] that an error is harmless if a court, after a "thorough examination of the

---

[12]   Neder used the standard first set forth in Chapman, 386 U.S. at 24. (In Chapman, "we said, [the test] is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'").

record," is able to "'conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error.'" Skilling, 638 F.3d 480, 482 (5th Cir. 2011) (quoting Neder, 527 U.S. at 19). Neder and Skilling both involved direct appeals, rather than collateral review of a state-court proceeding, as was the case in Brecht, an action filed pursuant to § 2254. In § 2255 proceedings, courts have generally applied Brecht. See United States v. Dago, 441 F.3d 1238, 1246 (10th Cir. 2006) (applying Brecht); United States v. Montalvo, 331 F.3d 1052, 1057-58 (9th Cir. 2003) (same); Ross v. United States, 289 F.3d 677, 682 (11th Cir. 2002) (same); Murr v. United States, 200 F.3d 895, 906 (6th Cir. 2000) (same); contra Lanier v. United States, 220 F.3d 833, 839 (7th Cir. 2000) (applying Neder). The Fourth Circuit has not directly addressed the question of the proper harmless error standard for constitutional violations under § 2255. In United States v. Owen, 407 F.3d 222, 229 (4th Cir. 2005), the Fourth Circuit declined to address the issue because the petitioner could not meet either the Brecht or direct review harmless error analysis of Chapman, 386 U.S. at 24.

Since Skilling, courts within the Seventh Circuit have continued to apply Neder in § 2255 proceedings attacking convictions post-Skilling. Ryan v. United States, No. 10 C 5512, 2010 WL 5495015, at *983 (N.D. Ill. Dec. 21, 2010); Sorich v. United States, Nos. 10 C 1069, 10 C 1089, 10 C 1091, 2011 WL

3420445, at *7 (N.D. Ill. Aug. 4, 2011).

The court disagrees with this approach in cases such as this one seeking coram nobis relief.  The court in <u>Brecht</u> made clear that the "<u>Kotteakos</u> harmless-error standard is better tailored to the nature and purpose of collateral review than the <u>Chapman</u> standard ...." <u>Brecht</u>, 507 U.S. at 623.  <u>Brecht</u> clearly addresses the situation at hand, a collateral attack[13] on Petitioner's conviction, not a direct appeal.  As such, <u>Brecht</u> is the proper standard.

In summary, the harmless error analysis from <u>Brecht</u> and its progeny is the proper test for determining prejudice under the cause and prejudice prong of the procedural default analysis (as well as the harmless error analysis itself in this coram nobis proceeding).

Based on the above, the court proposes that the presiding District Judge utilize the harmless error analysis from <u>Brecht</u> and its progeny to determine actual prejudice for purposes of

---

[13]  The fact that Petitioner seeks relief based on coram nobis rather than pursuant to § 2255 does not change the analysis.  Section 2255 is not available because Petitioner is no longer in custody, but coram nobis relief is widely (and logically) viewed as collateral relief.  <u>See</u> <u>United States v. Spellissy</u>, No. 11-10107, 2011 WL 3629910, at *2 (11th Cir. Aug. 16, 2011) (in post <u>Skilling</u> coram nobis proceeding, court observed that coram nobis is a form of collateral relief and that <u>Brecht</u> is the better standard for demonstrating harmless error); <u>Godoski v. United States</u>, 304 F.3d 761, 762 (7th Cir. 2002) ("<u>[C]oram</u> <u>nobis</u> is used only in those rare situations when the defendant is no longer 'in custody' (rendering § 2255 unavailable) yet collateral relief remains imperative to deal with lingering civil disabilities."); <u>Belcher v. United States</u>, Civil No. 1:10-0398, 2010 WL 2509870, at *4 (S.D. W. Va. Apr. 8, 2010) ("Collateral relief is available to persons who have completed their sentences and are therefore not in custody under very limited circumstances through Writs of Error <u>Coram</u> <u>Nobis</u> ....").

overcoming procedural default.  Obviously, if the court finds that any error was not harmless under <u>Brecht</u>, then Petitioner has met his burden of showing prejudice sufficient to excuse his procedural default.  As discussed further below, this is not the court's recommendation.

> **ii.  The <u>Skilling</u> error in this matter was harmless pursuant to <u>Brecht</u> and its progeny, and, as a result, Petitioner cannot show actual prejudice for purposes of procedural default.**

Turning to harmless error, in <u>Skilling</u>, the indictment against Jeffrey Skilling alleged three objects of the conspiracy - honest services wire fraud, money-or-property wire fraud, and securities fraud.  The Court in <u>Skilling</u> determined that honest services wire fraud under § 1346 covered only bribery and kickback schemes.  As a result, "Skilling's conviction [was] flawed."  <u>Skilling</u>, 130 S. Ct. at 2934 (citing <u>Yates v. United States</u>, 354 U.S. 298 (1957) (constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory)).  However, the Court in <u>Skilling</u> directed that "[t]his determination ... does not necessarily require reversal of the conspiracy conviction [because such errors] are subject to harmless-error analysis."  <u>Skilling</u>, 130 S. Ct. at 2934 (citing <u>Hedgpeth</u>, 555 U.S. at 61).

In <u>Hedgpeth</u>, the Court, in a <u>per</u> <u>curiam</u> decision, ruled that instructing a jury on multiple theories of guilt, one of which is invalid, is not structural error requiring that a conviction based

on a general verdict be set aside on collateral review without regard to whether the flaw in the instruction prejudiced the defendant. Instead, the flaw is subject to Brecht's harmless error analysis, i.e., whether the instructions "'had substantial and injurious effect or influence in determining the jury's verdict.'" Hedgpeth, 555 U.S. at 58 (quoting Brecht, 507 U.S. at 623).

As in Skilling, this action involves multiple theories of guilt, one of which is invalid. The two-count indictment against Petitioner alleged wire fraud in Count One and securities fraud in Count Two. The wire fraud count (Count One) included alternative theories of criminality, defrauding of honest services and defrauding of property, i.e., confidential nonpublic information.[14] (ECF No. 109-1, p. 5.) Count One of the indictment very clearly contains alternative theories in describing the "scheme and artifice" that form the basis of that count:

> a. To defraud the State of West Virginia, the West Virginia Lottery, and the citizens of the State of West Virginia of his honest and faithful services as an employee, that is, the attorney for the West Virginia Lottery; and
> b. To defraud the State of West Virginia and the West Virginia Lottery of certain property, that being certain confidential nonpublic information.

(ECF No. 109-1, pp. 4-5.) In ReBrook, in denying Petitioner's motion to dismiss, Judge Haden acknowledged that Petitioner was charged with wire fraud based on an honest services theory, but

---

[14]  In Carpenter, the Court recognized that "[c]onfidential business information has long been recognized as property." Carpenter, 484 U.S. at 26.

also that the

> indictment here relies on the same factual predicate for
> both the charges of insider trading [Count Two] and wire
> fraud. The Government charges the Defendant with devising
> a scheme to defraud the State of West Virginia, its
> citizenry, and the Lottery of Defendant's honest and
> faithful services as Lottery attorney by misappropriating
> and utilizing confidential nonpublic information
> regarding an alleged plan to expand video lottery in West
> Virginia. The indictment also accuses Defendant of
> trading in and tipping others to trade in VLC stock based
> on the confidential information.

ReBrook, 837 F. Supp. at 167.

In his opening statement, counsel for the United States makes clear that the case is about the "misuse of confidential information and the failure of an employee to render his honest and faithful services." (# 83, p. 86.)  Counsel explained that

> there are two counts in this case and the [Petitioner's]
> stock purchase is unlawful in two ways. First in buying
> the stock the [Petitioner] was using confidential
> information gained in the course of his employment for
> his own benefit.  Thus in making that wrongful use of his
> confidential information, the [Petitioner] defrauded his
> employer of what he owed his employer, which was his
> honesty, his honest services.  Second, count 2, it's
> simply against the law to make stock purchases based on
> insider information you've gotten through a relationship
> of trust.

(# 83, pp. 93-94.)  Again, counsel's description delineates the two theories of the wire fraud claim; the buying of stock using confidential information gained in the course of his employment for his own benefit and making wrongful use of that confidential information and defrauding his employer of honest services.

In closing arguments, counsel for the United States addressed

the honest services aspect of the case, but also addressed the theory that Petitioner defrauded the State and the Lottery of certain property:

> While [Petitioner] ow[n]ed the stock, all the stock he could afford to buy, he continued to represent the State of West Virginia in the Lottery Commission.  He continued giving legal advice while the commission ... [while concealing] from the commission, ... that he has a personal financial stake in the outcome of their decision.  He concealed from them his plan.
>
> He had a plan.  His plan was to hold the stock until VLT got the contract for 25 million dollars. *** He was going to wait until they got the contract and then he was going to sell his stock and take his profit.  That's not honest.  That's not acting in good faith.  That is not an honest mistake.  That is a fraud.  It's a fraud on the Lottery Commission.  It's a fraud on the State of West Virginia.  By buying this stock and using this inside information, stolen information, by concealing his ownership of that stock and going ahead and advising the Lottery Commission, he defrauded the State of West Virginia out of its rights to his honest services.  That's the charge in count 1.
>
> The charge in count 1 is wire fraud.  Count 1 charges the fraud scheme I have just described to you, buying the stock on insider information and defrauding the state by concealing his ownership of that stock.  It's also charged in there that the execution of that fraud scheme he sent or caused to be sent certain signals, certain wire communications in interstate commerce.

(# 86, pp. 560-61.)

Finally, both the honest services and the property theories were presented to the jury in the jury instructions at the conclusion of the trial.  Judge Haden specifically stated that

> I've used the term "scheme and artifice." And as that is used in the wire fraud statute, that would include any plan or course of action intended to deceive others and

> to obtain by false or fraudulent pretenses money or property from the person or entity so deceived.  For the purpose of the wire fraud statute, the term "scheme or artifice to defraud" includes also a scheme or artifice to deprive another of the intangible right of honest services.
>
> * * *
>
> A scheme to defraud is, therefore, any plan or design by which a person seeks to obtain money or property from another or defraud someone or some entity of honest services due them or it.

(# 86, pp. 588, 590.)

The post conviction decision by Judge Haden, in addressing Petitioner's request for a new trial, provides little in the way of discussion or relevant information about property fraud because Petitioner did not seek relief related to that aspect of his conviction.  Petitioner's motion dealt with the wire fraud charge insofar as it related to honest services, not property fraud.  However, in analyzing whether an instruction was warranted about the specific duties the Rules of Professional Responsibility imposed on lawyers regarding confidentiality of information, the court acknowledged in its decision that

> the evidence supported the government's charge [that Petitioner] used confidential information he gained by virtue of his position as Lottery counsel to garner profit for himself and his friends.

ReBrook, 842 F. Supp. at 894.[15]  Count Two alleged securities fraud based on the same facts as those that form the basis of the

---

[15] Likewise, on direct appeal to the Fourth Circuit, our Court of Appeals did not directly address the property fraud aspect of the case, but again, this issue was not before it.  ReBrook, 58 F.3d 933 (4th Cir. 1995).

fraudulent scheme contained in Count One.  (ECF No. 109-1, p. 13.)
The jury returned a general verdict, finding Petitioner guilty on
both counts.  (# 60.)

Because his honest services conviction in Count One is invalid
under <u>Skilling</u> and there has been no suggestion of kickbacks or
bribes[16], Petitioner's conviction is flawed.  However, a harmless
error analysis is appropriate given the alternative theories of
guilt clearly delineated throughout the trial process.

The court cannot propose a finding that the <u>Skilling</u> error had
a "'substantial and injurious effect or influence in determining
the jury's verdict.'"  <u>Brecht</u>, 507 U.S. at 623 (quoting <u>Kotteakos</u>,
328 U.S. at 776).  Upon careful review of the record, pursuant to
<u>O'Neal</u>, the court is not even close to having "grave doubt" that
such error had a substantial and injurious effect in determining
the jury's verdict.

Despite the error at trial related to the honest services
aspect of Count One, such error did not substantially affect the
jury's verdict.  The Petitioner was charged with defrauding the
State of West Virginia and the Lottery because he fraudulently
appropriated property; i.e., confidential nonpublic information
relating to the value of the VLC stock.  Petitioner knew of the
governor's undisclosed plans to allow statewide expansion of video

---

[16]   The United States conceded at the hearing on the Petition that there
was no evidence of kickbacks or bribes.  (ECF No. 116, p. 32.)

lottery immediately following the general election in 1992; he knew which company would win the video lottery sole source contract (VLC); and he knew that although VLC's stock dropped in September of 1992, it would not be dropping further.  Petitioner used this confidential information to purchase VLC stock.  This underlying scheme to defraud the State of West Virginia and the Lottery of property was the basis of both counts.  Had the jury not believed that Petitioner engaged in this fraudulent activity, it could not have returned a guilty verdict on either count, as it did.  As such, the presence of the honest services claim in Count One did not have a substantial and injurious effect or influence in determining the jury's verdict on either count.[17]

Petitioner urges this court to rely on Mandel, where mail fraud convictions against the former governor of Maryland, Marvin Mandel, and others, were vacated.   In Mandel, the jury was instructed

> solely on the theory that the State of Maryland had been
> denied the "faithful and loyal services of public
> officials."  This was annunciated by the fact that the
> bribery instruction offered by the defendants, requiring
> a finding that the State was defrauded of a money or
> property interest, was denied by the district court at
> the government's urging.

Mandel, 862 F.2d at 1074.  In Mandel, our Court of Appeals found that "the jury instructions were insufficient and the convictions

---

[17]  Even under the more stringent standard used on direct review, the court's recommendation is the same.  "[B]eyond a reasonable doubt ... the jury verdict would have been the same absent the error."  Neder, 527 U.S. at 19.

for mail fraud cannot be upheld under <u>McNally</u> standards." <u>Id.</u>

    <u>Mandel</u> is distinguishable because, as discussed at length herein, the instant matter involved alternative theories, whereas <u>Mandel</u> did not.   Furthermore, in <u>Mandel</u>, the court found that where the jury considered alternate theories of liability, "we must reverse the convictions if either theory is an improper basis for punishment." <u>United States v. Mallas</u>, 762 F.2d 361, 363 n.3 (4th Cir. 1985) (citing <u>Chiarella v. United States</u>, 445 U.S. 222, 237 n.21 (1980)).   If both theories were presented to and considered by the jury, "we must be able to say 'with a high degree of probability' that the jury did not rely on the legally incorrect theory." <u>Mandel</u>, 862 F.2d at 1073 (quoting <u>United States v. Alexander</u>, 748 F.2d 185, 189 (4th Cir. 1985)).   Post <u>Brecht</u> and <u>Hedgpeth</u>, the standard is harmless error, and one invalid alternative theory does not necessitate reversal.

    Based on the above, the court proposes that the presiding District Judge find that Petitioner was prosecuted for wire fraud based on a valid property fraud theory.   The court further proposes that the presiding District Judge find that while Petitioner has demonstrated cause, he has not shown prejudice.

    **c.   Petitioner is not actually innocent.**

    As noted above, actual innocence "means factual innocence, not mere legal insufficiency." <u>Bousley</u>, 523 U.S. at 623.   To prevail under an actual innocence theory, a petitioner must show

that "'in light of all the evidence,'" "it is more likely than not that no reasonable juror would have convicted him." Schlup v. Delo, 513 U.S. 298, 328, 327 (1995) (internal quotations and citations omitted). "In cases where the Government has forgone more serious charges in the course of plea bargaining, petitioner's showing of actual innocence must also extend to those charges." Bousley, 523 U.S. at 624-25.

The court proposes that the presiding District Judge find that Petitioner cannot show actual innocence as to the property fraud prong of Count One, the wire fraud count, or Count Two, the securities fraud count; i.e., that Petitioner cannot show it is more likely that not, in light of all of the evidence, that no reasonable jury would have convicted Petitioner on either count.

As discussed above, Count One consists of a claim for deprivation of property, and Petitioner has made no argument as to his actual innocence on this aspect of Count One.

Turning to Count Two, the jury convicted Petitioner of securities fraud. While his conviction was later overturned based on Bryan, the court in O'Hagan later held the theory of prosecution used by the government was valid. The government could have appealed the reversal of Petitioner's conviction, but this did not occur. Nevertheless, the jury convicted Petitioner on a valid securities fraud theory, and this obviously is very strong evidence of guilt, not actual innocence.

Petitioner concedes, as the United States points out, that he makes no effort to defend himself factually on the securities fraud count because he was acquitted of that count as a matter of law.  According to Petitioner, his acquittal based on the finding in <u>Bryan</u> that the misappropriation theory was not viable is the law of the case and governs any subsequent proceedings including this one.  To the extent any exceptions to the law of the case doctrine apply, such as that controlling authority has since made a contrary decision of law applicable to the issue, Petitioner points to double jeopardy and argues that he "cannot be subjected to any further prosecution or punishment on that same charge under double jeopardy principles, even where a subsequent appellate decision determines in another case that the noncriminal conduct may be criminal."  (ECF No. 121, p. 4.)

Petitioner's argument that the securities fraud count essentially cannot be considered in the actual innocence[18] determination ignores a number of factors.  "'Actual innocence' means factual innocence, not mere legal insufficiency."  <u>Bousley</u>,

---

[18]   In <u>Sawyer v. Whitley</u>, 505 U.S. 333, 339 n.5 (1992), the Court noted its standard for determining actual innocence as follows:

"[T]he prisoner must 'show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial, the trier of the facts would have entertained a reasonable doubt of his guilt.'" [<u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 455 n.17 (1986)(]quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U.Chi.L.Rev. 142, 160 (1970)[)].

523 U.S. at 623-24. The securities fraud count may be legally insufficient in that the United States cannot now move to reinstate the verdict or otherwise prosecute Petitioner for this claim, but there has been no offer of evidence that Petitioner is actually innocent of the conduct for which the jury convicted him.

Furthermore, assuming the law of the case argument somehow applies here, there are exceptions, including that "controlling authority has since made a contrary decision of law applicable to the issue ...." Sejman v. Warner-Lambert Co., Inc., 845 F.2d 66, 69 (4th Cir. 1988) (quoting E.E.O.C. v. International Longshoremen's Assoc., 623 F.2d 1054, 1058 (5th Cir. 1980)). The intervening case of O'Hagan places Petitioner squarely within this exception to the law of the case theory espoused by Petitioner.

The Double Jeopardy Clause of the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb ...." U.S. Const. amend. V. Generally, the Double Jeopardy Clause "protects against a second prosecution for the same offense after conviction or acquittal, and against multiple punishments for the same offense." Palazzolo v. Gorcyca, 244 F.3d 512, 516 (6th Cir. 2001). Petitioner's conviction for securities fraud was vacated based on Bryan, and this proceeding does not pose a danger of prosecuting him a second time for the offense.

Finally, the court notes that the actual innocence analysis

88

allows for the consideration of more serious charges forgone by the government in plea bargaining: "In cases where the Government has forgone more serious charges in the course of plea bargaining, petitioner's showing of actual innocence must also extend to those charges." Bousley, 523 U.S. at 624. It stands to reason that Petitioner should have to show his actual innocence on the securities fraud claim even though it was vacated and not ultimately pursued again by the government. Such a claim is akin to a claim bargained away by the government in plea negotiations. As discussed above, Petitioner has not met his burden of showing actual innocence on either count, and the court proposes that the presiding District Judge so find.

In summary, because Petitioner has shown cause but cannot show prejudice or actual innocence, his procedural default in this matter cannot be excused.

Finally, Petitioner urges this court's reliance on Fourth Circuit cases which Petitioner contends have been more concerned with addressing fundamental fairness and less concerned with procedural correctness. In particular, Petitioner points out that some courts may actually use a less-stringent standard of review for coram nobis or habeas corpus in instances where there has been a change in law. See United States v. Hoffman, Case No. 88-5686, 1991 WL 29049, at *1 (4th Cir. March 8, 1991) (granting coram nobis relief even though the petitioner never filed an appeal);

<u>Mathis v. United States</u>, 369 F.2d 43, 48 (4th Cir. 1966) (same, and granting relief even though the petitioner was only awaiting a federal detainer and had not yet served his term of federal incarceration); <u>United States v. Shamy</u>, 886 F.2d 743, 743-44 (4th Cir. 1989) (granting coram nobis relief even though the petitioner had failed to seek the appropriate jury instruction at trial); <u>Ingber v. Enzor</u>, 841 F.2d 450, 454 (2d Cir. 1988) (noting, in a motion brought under 28 U.S.C. § 2255, that "although Ingber failed to raise his present challenge on appeal or in a petition for writ of certiorari, retroactive application is necessary to avoid an unfair result .... To say that in such circumstances the system of justice can provide no remedy because of a court-made rule that failure to take a direct appeal on the specific issue bars all later motions for collateral attack ... indicates a lack of due process in the judicial system.") (internal quotations omitted); <u>Ross v. Reed</u>, 704 F.2d 705, 708-09 (4th Cir. 1983) (granting habeas corpus to a state inmate who procedurally defaulted on an issue, and noting that "[a]ppellate courts are already overburdened with meritless and frivolous cases and contentions, and an effective appellate lawyer does not dilute meritorious claims with frivolous ones. Lawyers representing appellants should be encouraged to limit their contentions on appeal at least to those which may be legitimately regarded as debatable."). Petitioner further suggests that <u>Osser</u> is

distinguishable.  (ECF No. 110, pp. 5-11.)

The court declines to address Petitioner's argument in light of the fact that the court has conducted a harmless error analysis.

### 3. Assuming Petitioner could overcome the procedural default in this matter, any <u>Skilling</u> error was harmless.

Based on the reasoning above in analyzing actual prejudice related to Petitioner's procedural default, and assuming Petitioner could overcome the procedural default in this matter, the court proposes that the presiding District Judge find that any error related to the honest services theory was harmless.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner is in procedural default on his coram nobis claim and has not shown grounds upon which to excuse such procedural default, and even assuming he has, any <u>Skilling</u> error was harmless such that he is not entitled to coram nobis relief.

It is respectfully **RECOMMENDED** that the presiding District Judge **DENY** the Petition for a Writ of Error Coram Nobis.

The parties are notified that this Proposed Findings and Recommendations is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B) and Rule 72(b)(1) of the Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing) from the date

of filing this Proposed Findings and Recommendations within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendations to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be served on the United States Attorney and Judge Copenhaver.

The Clerk is directed to transmit this Proposed Findings and Recommendation to counsel of record.


January 5, 2012
         Date

Mary E. Stanley
United States Magistrate Judge